26 C.C.P.A.(Patents)

**STENGER et al. v. HOLMES.**

**Patent Appeals No. 4095.**

Court of Customs and Patent Appeals.

May 1, 1939.

Rehearing Denied June 15, 1939.

Allen & Allen, of Cincinnati, Ohio (Charles E. Riordon, of Washington, D. C., and Marston Allen, of Cincinnati, Ohio, of counsel), for appellants.

Louis A. Maxson and Loyd H. Sutton, both of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal, in an interference proceeding, from a decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences awarding priority of invention of the subject matter defined in the counts to Morris P. Holmes, the senior party.

The interference involves two applications of the party Holmes, Serial No. 649,003, for mining machines, filed December 27, 1932, and Serial No. 658,804, for cutter chains, filed February 27, 1933 and an application of Stenger and Bruestle, Serial No. 675,897, for mining machinery cutting bit and mounting therefor, filed June 15, 1933.

The counts are as follows:

"1. In a mining machine chain, a chain block, a bit holder having a head and a shank, said block including a socket for

said shank, said bit holder having a bit receiving bore obliquely disposed downwardly through the head thereof, a cutter tooth having opposingly diagonally cut ends providing sharp points at the same side of the tooth, said cutter tooth mounted in said head bore with one end resting on the block.

"2. In a cutter chain, a bit block, a bit having a pair of plane cutting surfaces at its opposite ends and lying in oblique planes disposed at an obtuse angle with each other, and means for holding said bit in position on said bit block including a surface on the bit block parallel to the path of travel of the cutter chain engageable with one of said plane surfaces on the bit."

The invention pertains to double ended cutting bits and mountings therefor on links of an endless sprocket chain, the chain structure being so supported that it is thrust ahead of the machine to cut layers of coal.

Both parties filed preliminary statements, but the dates contained therein are immaterial since the tribunals below awarded priority of invention of the subject matter in the counts involved to appellee on the ground that, while the junior parties were first to conceive, they did not prove a reduction to practice of the invention in issue prior to constructive reductions to practice by appellee, and on the further ground that appellants did not establish that they were using reasonable diligence toward reducing the instant invention to practice at a time just prior to December 27, 1932 or just prior to February 27, 1933, the filing dates of the applications of appellee, nor after said dates. Appellants were accorded March 25, 1932 as a date of conception of the invention. Priority of said conception is not disputed by appellee.

Both parties took testimony. The record is quite lengthy and exhibits are numerous.

It appears that on February 10, 1932 a letter was written to a Mr. Cunningham, general superintendent of the Linton Summit Coal Company, at Linton, Indiana, by the Cincinnati Mine Machinery Company, assignee of appellants, requesting that he inform appellant Stenger if he would allow the Cincinnati Mining Company to conduct some experiments in one of the Linton company's mines. The letter, in part, states:

"We have something entirely new which I imagine you will be exceedingly interested in. * * * These experiments will in no way interfere with production—in fact, we are positive that the coal production during the time of the experiments will be increased."

Permission having been received, the appellants on March 25, 1932, tested their device in one of the mines of the said coal company. They brought 40 holders and a greater number of bits to the mine and requested to be sent to where there was the hardest cutting. The superintendent told them he "would give them a real test," and informed them that they were to go to the machine operated by the witnesses Willoughby and his assistant, Goodwin. The coal to which they were assigned to cut in testing their bits and holders was, according to Mr. Cunningham, " * * * the hardest cutting that I ever saw cut with a chain machine." By hard cutting is meant the presence of sulphur balls or sulphur bands, which are impurities in the coal. The record shows that when sulphur balls are encountered in cutting with a chain machine, the bits are always broken, dulled and bent and rendered unfit to function as cutting means.

The bits and holders of appellants, the combination of which satisfies the requirements of the counts, were fastened in the lugs of the chain cutter which the operators placed at the disposal of the appellants. The lug has a deep recess into which the shank of the bit holder fits snugly. The bit holder was then made fast by a set screw extending through the forward wall of the lug. The bit itself, of angled cross section stock, was placed in position in the holder by passing it through a similarly angled passage in the holder so that the idle cutting end of the bit rested upon the top surface of the lug. In appellant's construction, outward displacement of the bit from the holder is said to be prevented by a button on the holder beneath the active end of the bit. The button is held in position by a screw which passes through the button and is countersunk in it. The screw, however, does not hold the button against the bit, "a very slight clearance being maintained for working purposes." The bit could be reversed so that the said idle end could be placed in cutting position when found desirable.

The cutting machine when equipped with the holders and bits of appellants was directed against the face of the coal and was started in operation. In coal mining

with a chain cutting machine it is evident that, at the bottom of the "room," a short space above the fire clay, the tip of the cutting chain supported by its arm is directed to cut its way through the face to the desired depth. This is called "sumping." After the "sumping," is accomplished, a cut is made away from the "rib," a lateral end of the room, transversely to the other lateral end of the room and to the depth established by the "sumping." When the room has thus been cut as aforesaid, holes are drilled at desired places above the cut and blasted, thus breaking down the coal between the said holes and the said cut.

In the test of appellants' bits and holders the sumping was accomplished smoothly and efficiently. However, in making the transverse cut, when the machine had progressed about 3 or 4 feet from the rib a sulphur ball was encountered. The machine was then withdrawn from the cut and it was discovered that several of the bits had been dulled so as to require reversing. After reversing the bits the machine was again put in operation and in accordance with mining practice the cutting structure was tilted downward to cut under the sulphur ball and the cut continued to about two-thirds of the width of the room, a distance of from 18 to 20 feet. In getting under the sulphur ball the top bits were dulled and it appears that the operators could not "get the machine to come back up." It was then cutting in rock and fire clay. In an attempt to bring the machine up the witness Goodwin testified that: "We cut probably two-thirds of the room, and in trying to get the machine to come up my buddy had a jack pipe or tie under the machine in order to raise it, and the tie caught in the bits, kicking the machine out partly from under the coal, and then, why, we put our old bits back in."

The test described occupied from one or one and one-half to two hours. The cutting of the room was finally completed with the use of other bits which were of the kind which had been used before the test. It took, however, several changes of these bits from those that became dull to sharp ones in order to get the cutter "out of the bottom" and complete the room.

After the test the holders and bits were placed in sacks and brought back to Cincinnati. While appellants were in the said room they discussed, in the presence of the witness Willoughby, the making of changes in the bits and holders and as they came out they met the witness, Cunningham, showed him the bits and holders and said that they would have to make some changes on them and "that they figured it was going to work out all right." In answer to the following question by counsel for appellants, the witness Cunningham made the following answer: "Q. Were they satisfied with the test? A. Yes, sir; they were."

The above question was objected to as hearsay and calling for a conclusion. The Examiner of Interferences considered this answer, however, in connection with the above statement concerning having to change the bits as follows: "If these answers are to be reconciled, it would appear that Stenger and Bruestle were satisfied that the test was sufficient to show that the device would have to be changed, and that then it possibly would work out all right."

There can be no doubt but that the device of appellants could and did cut coal and it seems clear to us that the test to which it was subjected was extremely rigorous. The chain cutter in which the bits and holders were placed was provided with bad set screws and the chain and cutter bar were worn to a great extent. Evidently some of the holders and bits were knocked out of the chain lugs by reason of the defective set screws becoming loose while the cutter was in operation. The record, however, is silent as to whether, when the usual holders with the bits made part thereof were used, the set screws held the shanks securely.

As far as the invention defined by the counts is concerned, nothing at all was done by appellants after the said test except to file their application for a patent on June 15, 1933. They did set about to develop a cutting tooth and holder and finally adopted a structure which they put on the market. It is conceded by appellants that this interference does not involve their subsequent improvements so it is not necessary to discuss them other than to state that apparently their further work on a new kind of assembly, eventuated in a patent.

The record discloses that appellants became aware of the device of the Sullivan Machinery Company, assignees of appellee, similar to the structure tested by appellants in May 1933. In that month they had

received "a very complete drawing of the device" and also saw a copy of the June 1933 issue of the Coal Age magazine which had a picture of the said Sullivan device upon the cover. Appellants then immediately became interested in the structure they had tested as aforesaid and filed their application on June 15, 1933. They stated that, while they are not qualified in matters of patent law, they feared their possible loss of British patent rights due to the publication shown on the said magazine, and, therefore, took immediate steps to file their involved application.

We cannot say from the facts appearing in this record that appellants were satisfied that they had reduced their involved invention to practice. We cannot see why, if they were so satisfied, they laid it aside for more than fourteen months and devoted their activities to a solution of the same problem on a different invention. They stated that they would have to make some changes in their bits and holders, after they made the test, as aforesaid, but the changes they made, it is admitted, took their subsequently developed structure away from the limitations of the present counts. Since they were, in our opinion, stirred into activity by learning of the device of appellee we think that the tribunals of the Patent Office came to a reasonable conclusion in holding that the alleged reduction to practice resulted in nothing more than an abandoned experiment. Lemp v. Mudge, 24 App.D.C. 282; Paul v. Hess, 24 App.D.C. 462; Hillard v. Brooks, 23 App.D.C. 526; Krueger v. Chabot, 83 F.2d 832, 23 C.C.P.A., Patents, 1128.

We have examined with care the authorities cited by appellants in support of their contention that there has been a reduction of the invention to practice, but they are not applicable to the facts and circumstances appearing in the record before us.

It appears that the present application of appellants was involved in another interference No. 68,217 with the application of one Ross. Both interferences were declared on April 3, 1934.

In the present interference, No. 68,218, appellants petitioned the Commissioner of Patents to suspend the proceedings "pending the rectification of a grossly unjust situation hereinafter detailed, either by the parties or by the Commissioner of Patents."

The commissioner's decision denied the said petition and upon a petition for reconsideration it was again denied in a decision which states:

"It will be noted that the only definite action requested of the Commissioner in the petition is that he suspend the interference proceedings. Petitioners do not propose any definite action either by the Commissioner or by the parties themselves for rectifying the allegedly unjust situation."

The situation here presented may be stated as follows:

"Petitioners' application here involved was previously involved in interference No. 68,217 with an application of Ross which is assigned to the owner of the Holmes application involved in the instant interference. That interference was dissolved following motions by both parties to dissolve on the ground that the issue was unpatentable. Neither party moved to add counts under Rule 109. In the interference notice sent to the party Ross the examiner stated that claims 9, 18, 28, 29 and 30 would be held subject to rejection as unpatentable over the issue in the event of an award of priority adverse to applicant. After the interference was dissolved the examiner, after considering several arguments presented by the party Ross, allowed certain of the claims in question as well as some additional claims, and thereafter the Ross patent issued.

"Petitioners particularly complain of the allowance of these claims to Ross and state that they relied on the statement of the examiner that such claims were not patentable over the issue of the interference, and for that reason made no motion under Rule 109 to add such claims to the interference. It is not deemed that the statement by the examiner constituted any guarantee that the claims mentioned would not be allowed later. It was merely an expression of the examiner's opinion at the time the interference was instituted. It was not a final adjudication that the claims in question were unpatentable and therefore did not relieve petitioners, who were the junior party, from the duty of presenting such claims by motion under Rule 109 if they desired to contest priority thereon."

Appellants now ask this court in interference No. 68,218 to relieve them from the consequences flowing from the dissolution of interference No. 68,217.

This we may not do. We may only review matters which have been before the Board of Appeals and are properly brought before us on appeal. The said matters presented here by reasons of appeal 19 to 22, inclusive, were not before the board and are not before us. The only issue before us is that of priority between appellants, Stenger and Bruestle and appellee, Holmes. Since reasons of appeal 19 to 22, inclusive, have no bearing upon this issue they cannot be considered by us.

The decision of the Board of Appeals is affirmed.

Affirmed.