MINNESOTA MINING & MANUFAC-
TURING COMPANY, a Delaware
corporation, Plaintiff,

v.

DITTO, INCORPORATED, a Delaware
corporation, Defendant.

No. 4-60 Civ. 60.

United States District Court
D. Minnesota,
Fourth Division.

April 17, 1963.

This proceeding is before the Court on the retrial of the issue as to the validity of the Miller patent, No. 2,740,-896.

William H. Abbott, St. Paul, Minn. (Edward A. Haight and John W. Hofeldt, Chicago, Ill., of counsel), for plaintiff.

James P. Hume and James M. Wetzel, of Byron, Hume, Groen & Clement, Chicago, Ill., and Paul J. McGough, Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

The Court heretofore had determined as the result of the first hearing that the patent was invalid primarily by reason of the teachings of one Niepce as reflected in his article published in London in the Photographic News on June 3, 1859. Reference also was made in the Court's memorandum decision to the so-called Hunt article in the Philosophical Magazine and Journal of Science of July-December, 1840. The Court filed its memorandum decision on March 16, 1962. Findings of fact and conclusions of law were filed on July 17, 1962. In view of the finding of patent invalidity, the Court did not discuss the question of infringement and the alleged file wrapper estoppel.

Plaintiff filed a motion for new trial pursuant to the provisions of Rules 59 and 52(b), Federal Rules of Civil Procedure. The motion was based upon alleged errors of the Court and upon the ground of newly discovered evidence.

After a hearing, the Court on November 2, 1962, vacated its memorandum decision of March 16, 1962, and the findings of fact and conclusions of law and the judgment entered thereon, and granted plaintiff a new trial on the issue of the validity of the Miller patent. The new trial was heard on December 17 to 20, 1962. Both sides presented evidence, and the validity of the patent, therefore, is to be determined not only on the evidence before this Court at the first hearing from February 27, 1961, to March 3, 1961, but also on the evidence produced at the hearing from December 17 to 20, 1962.

The newly discovered evidence pertains to the discovery by the plaintiff of the original article in French presented by Niepce to the French Academy on May 23, 1849. The account published in the Photographic News purported to be an English translation thereof. The principle difference in the original French text and that which appears in the English translation is to be found wherein Niepce specifically states in the French text that a greasy ink image could be produced on sensitive paper when exposed to his method of heating, although aqueous or water-based ink would not produce copies. Plaintiff contends that the original French text confirms its position that it is the difference in the chemical constituents of the ink and not its absorptivity that Niepce noted when he discussed his success with printer's ink and his lack of success in using ordinary ink.

When the patent validity question was first considered by this Court, the position taken by the parties was substantially the same as that which is presented by the new evidence. However, the experiments made according to the teaching of Niepce have been greatly extended and broadened. Moreover, the evidence as to the difference as to the absorptivity of heat by graphic images as compared to the paper on which the images appear when heated to 100° C. has been convincingly established. In other words, the entire evidence impels a finding that there can be no heat pattern from any radiation produced at the temperature of boiling water. All of Niepce's experiments were made with a metal plate heated to 100° C., except that he does state that

"Paper prepared with very dilute nitric acid (1 percent.), or with a solution of 45 grains of cyanide of potassium to the ounce of water, is sufficiently sensitive to yield thermographic images, but only at a much higher temperature than 212° Fahr."

He states also, in referring to the images he produced, that "if it be not sufficiently distinct, it may be forced out by exposing the sheet of paper to the radiant heat from a fire." But there is nothing in Niepce's teachings which would indicate that in the use of any of these chemicals —nitrate and cyanide of potassium—in making heat-sensitive paper, he was aware that there would be any heat differential pattern created by radiant energy whereby the images on the original would absorb the increased radiation and conduct heat to the sensitive sheet and thus produce a copy.

The French text does lend weight to plaintiff's position that the reproduction of the printed page as produced by Niepce was due to the chemicals in the ink rather than by reason of any heat transfer. But the ultimate question before the Court is whether Niepce disclosed the placing of a graphic original in close contact with a heat-sensitive paper and then by radiant energy created a heat differential pattern whereby the characters on the paper would absorb the radiation and conduct that heat to his heat-sensitive paper and produce a copy. Or, stating it another way, did Niepce merely produce a copying of the graphic original on to the heat-sensitive paper by the application of heat and produce a chemical or a mere transferring by conduction of the graphic original on to the heat-sensitive paper?

Admittedly, the reproduction of the graphic original on to Niepce's conventional heat-sensitive paper when these papers are placed in close contact in a book without any heat, as disclosed by

plaintiff's new evidence, must be a process of chemical action. It cannot be successfully urged that in exposing this heat-sensitive paper with the graphic images produced under such circumstances "to the radiant heat from a fire" in order to make the image more distinct, this exposure to heat would be an illustration of the teachings of Miller in the use of radiant energy. A similar experiment with Thermofax paper and a graphic image placed in a book produced no reproduction. Likewise, when a graphic ink image is placed between two glass slides and heated to 100° C., and then the graphic image is removed and Niepce's heat-sensitive paper is placed between the same glass slides and re-heated, with a reproduction of the image on the heat-sensitive paper, the only explanation of this phenomena is that it represents a chemical process. And when a word is written in pencil on an ordinary sheet of paper with ruled lines and then this sheet is placed in close contact with Niepce's paper coated with silver nitrate and gold chloride and placed on a plate and subjected to the heat of boiling water, the ruled lines appear, but the writing with the pencil does not appear, the only explanation must be that a chemical process in obtaining the transfer was involved. When this experiment was produced with Thermofax paper and the Miller method, the pencil writing was reproduced, but not the ruled lines. It seems clear, therefore, that the inability of Niepce to reproduce carbon images was due to the fact that the black carbon inscriptions did not have the chemical ingredients to be reproduced on his sensitive paper at 100° C. And, moreover, the undeniable fact is from the evidence that at that temperature (100° C.) the absorptivity of the paper and the black carbon is substantially the same so that no heat differential pattern could be created. The Court over-simplified Miller's teachings in its original memorandum when it stated that Niepce accomplished the same results as Miller when he placed a heat-sensitive sheet in contact with a graphic original, and upon exposing this couplet

to the heat produced from a hot plate in contact with boiling water, a positive copy of the graphic original was obtained. The Court correctly stated Niepce's process, but failed to recognize that, although this early experimenter was aware that heat was essential to trigger the reproduction of a graphic image on heat-sensitive paper, he did not create a heat differential as between the graphic image and the paper on which the images appeared, and thus produce a reproduction of the images on heat-sensitive paper. And when Niepce stated that "calorific radiation" had much to do with it, "but the material vapours emanating from the heated objects doubtless play their part," this statement was not used in connection with any phenomena such as Miller taught in using radiant energy to create a heat differential pattern in the original graphic image. Rather, Niepce assumed that the heat and "vapours" he noted were present for the purpose of stimulating and effecting the chemical processes which he achieved. He did not conceive that selective heating had to be effected. This conclusion must be sound in view of the weight of the evidence that there is no substantial difference in the absorptivity of paper and carbon black when heated to the temperature of boiling water. Obviously, a uniform temperature absorbed by the graphic image and the paper on which it appears will not create a differential heat pattern so as to form a heat image on heat-sensitive paper. In fact, the evidence is convincing that with a temperature as high as 200° C., the radiation produced is so slight that it is absorbed by the white paper and relatively none of it reaches the carbon black. The evident reason, therefore, why Niepce could produce images from printer's ink and could not from carbon markings was due to the fact that he was dealing with chemical processes and not heat differentials as between the paper and the images thereon. And it is no answer to suggest the Niepce must have been dealing with old printed pages in performing his experiments and there--

fore that the printed pages with which he dealt had lost much of their chemical ingredients, and hence one should conclude that he was not creating some chemical phenomena. The experiments made in Court as to the ability of Niepce's method to reproduce ink images, and the failure when the chemical constituents of the ink were eliminated, would indicate that in his experiments Niepce was dealing with ink printing which had sufficient fats and oils so as to enable him by chemical processes to produce images on his heat-sensitive paper.

Although a reading of Niepce's paper may indicate in some instances that he knew that designs of dark parts were more sensitive by their reproduction by heat than the lighter parts of the paper on which the image appears, his understanding of their reproduction was based upon their chemical consistency rather than their heat absorptivity. The anomaly of cotton, colored blue with indigo with white spaces, producing a positive image, while Prussian blue on the same or similar material would be negative with the the white parts giving the image, and which puzzled Niepce, can only be explained by some chemical reaction, if it can be explained at all. And when he stated that "the intimate nature of the colouring matter or of the ink" influenced his ability to reproduce the image in that from one he obtained a positive and from the other a negative impression, it must be concluded that he was speaking of a chemical phenomena.

Defendant readily concedes that in some of his experiments Niepce was dealing with chemical processes. But it contends that graphic images can be produced by heat differentials according to Niepce's methods, and it sought to demonstrate its position by placing a cover glass about the size of a ten cent piece over part of an ink graphic image of triangular shape, and with Niepce's conventional heat-sensitive paper of gold chloride and silver nitrate in close contact subjected to 100° C. for some 60 minutes, it was able to produce the image including that partly covered by the glass piece,

although that portion of the image appeared with some imperfections. It is defendant's contention that the arrangement of this assembly removed all possibility of any chemical interaction between the chemical of the ink image covered by the glass cover piece and the heat-sensitive paper. Plaintiff's testimony was to the effect that its expert was unable to obtain any reproduction of the portion of the image under the glass in its attempt to perform the same experiment. Its position is that the reproduction of the image under the small cover glass must have been produced in defendant's experiment by conduction due to the arrangement of the assembly. Moreover, plaintiff contends that the amount of radiation passing through the small glass cover piece would be too insignificant to create a reproduction. And as to the relevancy of this experiment in attempting to interpret the teachings of Niepce, attention may be directed to the portion of his article wherein he stated that

"With the paper prepared with the salts of both silver and gold, and using the plate heated to the boiling point of water, the large letters of the print are copied at a distance of several millimetres; but the effect does not take place if there be interposed a continuous film of mica, metal, or even of rice paper, however thin it be."

Defendant proffered the results of certain experiments with heat-sensitive paper made with a nitric acid solution and that made with a solution of cyanide of potassium. As before indicated, Niepce stated in his article that heat-sensitive paper with these solutions would "yield thermographic images, but only at a much higher temperature than 212 degrees Fahr." Niepce did not disclose the results of his experiments with these types of heat-sensitive papers. However, at this hearing, defendant prepared heat-sensitive paper with these solutions and increased the heat source from 100° C. to about 460° C. An original sheet with an ink image was placed in close contact

with the heat-sensitive sheet, with a Mylar film covering one-half of the image, and after an exposure of this assembly for about one minute some two inches from the heat source, a charred sensitive sheet resulted with a darkened image visible thereon, but less distinct where the Mylar film covering had been placed. Defendant contends that in that the Mylar film being completely impervious to any chemical transmission of the darkened images to the heat-sensitive paper, this result sustains its position that Niepce's teachings included the production of a heat differential pattern by the conversion of radiant energy into heat which was absorbed by the darkened images and thus produced on the heat-sensitive paper. In one of the experiments at 460° C., a carbon pencil mark was faintly produced on a charred $HNO^3$ sensitive sheet.

It does not seem necessary to recount in detail the results attained by plaintiff's experts in utilizing cyanide and nitric acid heat-sensitive paper. Suffice it to say that, according to the evidence, plaintiff's experiments failed to produce any reproduction with cyanide or nitric acid heat-sensitive paper when heated at various degrees of heat from 300° C. to 1,000° C., except at the higher heat there were particles of charcoal which were picked or rubbed off on to the sensitive sheet. Whatever phenomena may have caused the darkened graphic image on the charred nitric or cyanide heat-sensitive papers when subjected to a heat of 460° C. in defendant's experiments, such charred reproductions are a far cry from the commercial reproduction of a printed page by a heat temperature differential on a heat-sensitive sheet as taught by Miller.

Benjamin Franklin recognized that dark clothes would absorb the sun's rays more readily than white ones, but if Niepce was assuming to carry out that well-known phenomena, he demonstrated quite the reverse in that graphic images of white ink when heated to 100° C., would be reproduced when placed on a black background, and when a black ink image was volatilized so as to eliminate or reduce the ink ingredients, no reproduction was obtained at 100° C. And the only time when a darkened carbon image, which should be most susceptible of absorbing heat created by radiant energy, was reproduced by anything that Niepce taught, it was by use of a cyanide heat-sensitive paper heated to some 460° C., and then a rather sorry exposition of an alleged heat differential pattern resulted.

It seems evident after the exhaustive experiments made by qualified scientists on each side that that which Niepce sought to teach, and did teach, was the reproduction of graphic images of printed characters, and also to copy coins, cameos, fabrics, feathers and engravings on to heat-sensitive sheets primarily by chemical processes or conduction induced by heat. And any attempt to construe his teachings as envisaging the creation of a heat differential pattern as between graphic images and the paper on which they appeared so as to reproduce the images on heat-sensitive paper by reason of the images absorbing the heat created by radiant energy, is to read in his literature this phenomena in light of the teachings of Miller. And one must not overlook the fact that there is unanimity among all the experts who testified that heat which merely creates a chemical phenomena by the transfer of graphic images on to a heat-sensitive sheet bears no relation to the phenomena of creating a heat differential pattern whereby radiant energy produces heat which is absorbed by the graphic images and thereby transferred to a heat-sensitive sheet. In Miller we are considering the intensity of radiation which is some 2,500 times greater than the intensity created at 100° C. And clearly, Niepce never conceived that not only must there be radiant energy converted into heat, but that it also must be applied briefly and with high intensity. The type, duration or intensity of radiant energy as taught by Miller is not to be found in Niepce.

The statement made by one of the expert witnesses of the defendant at the

rehearing may be noted. In referring to Niepce's article, he stated:

> "This whole article is vague as it is written. Today it wouldn't be accepted for publication. There aren't enough details in many places. One has to fill in as best as one can from one's scientific experience." (Tr., p. 237). .

This statement is particularly pertinent when one assumes to glean from Niepce's teachings the advance in the art made by Miller. Not only is Niepce's article vague in many particulars, but it is puzzling even today to learned scientific men. And of course the undeniable fact is that Niepce's article awakened no progress in the art for over one hundred years.

On this record, the Court cannot find with any assurance that in Niepce's teachings it would be evident to one skilled in the art that by the application of intense radiant energy to a couplet of a graphic image page and a heat-sensitive sheet there would be produced speedily and effectively a heat differential pattern so as to reproduce a graphic original on to the heat-sensitive sheet. The evidence produced by the plaintiff at the retrial has fulfilled the showing made by the affidavits filed in support thereof. And upon further consideration of Niepce's article and Hunt's teachings,* any doubt that the Court entertained as to the correctness of its views when it granted the motion for a new trial has been resolved into a confirmed conviction that the defendant has not sustained the burden of proof in establishing the invalidity of the Miller patent.

Although a portion of the Niepce article was published in the Scientific American on September 3, 1859, and hence had American circulation shortly after it was published in London, the record is barren of any progress by anyone in this country in furtherance of the teachings of Niepce. The Court recognizes that the views expressed herein cannot be reconciled with many of the statements contained in its memorandum decision of March 16, 1962. Obviously, the Court has completely reversed his thinking and conclusions as to the relationship between Niepce and the Miller patent. The Court's only response thereto is that, after further reflection and after hearing considerably more evidence on the entire subject, the views expressed herein reflect a more sound and a more realistic approach to the problem presented with respect to the validity of the Miller patent. And if able and distinguished scientists in this particular field cannot agree as to the teachings of Niepce and the relationship, if any, between the art as taught by Niepce and the art as developed in the Miller patent, it may be understandable that the Court has vacillated in its attempt to determine which of the litigants has brought forth the most convincing analysis and interpretation of a rather vexing problem.

The Court having now decided that the Miller patent is valid, the consideration of defendant's alleged infringement, which question was not determined in the Court's memorandum of March 16, 1962, is required. In considering this question, we are dealing only with the teachings of Miller in so far as his *method* of reproducing graphic images is reflected in Claims 1, 2, 3, 4 and 9 of the patent in suit. The Ditto machine is not involved in this patent suit. There must be true identity between the patent claims and the procedure followed by the defendant in the utilization of the Ditto machine in producing copies of graphic material in order to support plaintiff's claims of infringement. That there are differences in the two processes is readily evident. But plaintiff claims that there is at least an equivalency in the method employed by the defendant and that taught by

---

* Hunt did refer to calorific rays in that they were the "quickening agent," as he expressed it, but he was dealing with light-sensitive and not heat-sensitive experiments. The fact that Hunt stated that calorific rays are absorbed and retained with greater force by the dark parts of the image does not mean that he was creating or utilizing a differential heat pattern.

Miller. Plaintiff contends that defendant employs the heart of the Miller invention. Admittedly, defendant utilizes a machine which is strikingly similar to plaintiff's Thermofax. Defendant's Masterfax machine utilizes an intense and brief heat energy transferred into heat which creates a heat differential pattern on the graphic original so that there is reproduced on the material placed in close contact with the graphic original a reproduction of the images thereon. But in order to interpret and understand the advances in the art which support the Miller patent, recourse must be had to the rather tortuous route which Miller was required to travel, as reflected in the file wrapper history, before his patent was allowed. Miller's original patent claims are illustrated in his original Claim 1, which appears on page 9 of the File Wrapper. This read:

"A process for the production of permanent facsimile copies from a graphic original, comprising converting radiant energy to heat energy in a pattern determined by the original graphic subject-matter, and utilizing the resulting elevated-temperature pattern in producing a visible copy of said original graphic subject-matter on a separate heat-sensitive copying-surface."

The response of the Examiner in rejecting the process claims is reflected in the following comment, pages 34–35 of the File Wrapper:

"Claims 1–5 are rejected as failing to particularly point out and distinctly claim the alleged invention. In claim 1, for example, the recitations of 'converting' and 'utilizing' are not regarded as definite steps of a process, rather they are vague functions or reactions resulting from specific steps applied to specific materials such steps and materials not being recited in the claim. It appears that applicant uses a graphic original having a pattern having portions absorptive of said radiant energy and portions nonabsorptive of said radiant energy, said absorp-

tion converting said radiant energy to heat energy and exposes said graphic original to said radiant energy in contact with a heat sensitive copying layer which exhibits a permanent visible change upon exposure to heat."

In response to the Examiner's views, Miller then cancelled the process claims 1 to 5 and submitted new claims. And in these new claims he specifically defined the copying sheet as one capable of undergoing a visible change when heated. This is evident from the claims which were finally allowed. Claims 1 and 4 call for "a heat-sensitive copying-surface which changes visibly when heated"; Claim 2 calls for "a separate heat-sensitive copying-layer which exhibits a permanent visible change upon exposure to heat"; Claim 3 calls for "a separate heat-sensitive copying-paper transparent to said radiant energy and which exhibits a permanent visible change upon exposure to heat"; and Claim 9 calls for "the copy sheet coated with a composition which, responsive to heat causes a color change."

Defendant does not employ a sheet upon which the graphic original is reproduced that exhibits a permanent visible change or change in color when heated. This seems evident not only from the evidence, but from a detailed disclosure as to Ditto's process; that is, in Ditto's process where master or copies are produced, it uses a so-called carbon sheet which has a backing of paper having a coating of wax thereon and on which an ink or dyes are incorporated. There is a second sheet which is placed in close contact with the face of the carbon during the process of making copies. In plaintiff's Exhibit 16–a, Figure 1, the paper surface maintained in contact with the face of the carbon is the reverse side of the graphic original, and a third sheet is not utilized. However, in each of the Figures 2 to 6, inclusive, as reflected on Exhibit 16–a, a separate third sheet is required in addition to the original. In all of these methods, however, the waxy face of the carbon is placed in close and

direct contact with the associated surface of the contacting sheet. All of the assemblies as illustrated in Figures 1 to 6, Exhibit 16–a, are pressed forcibly together and against the underlying glass plate in the Masterfax machine. The radiant energy below the glass plate produces a heat pattern which conforms to the graphic original and the heat of the graphic original softens the wax of the carbon whereby the wax becomes sticky, and responding to the pressure, adheres to the contacting sheet. After cooling, the carbon sheet must be separated from its associated sheet. This results in a release of the portion of the waxy paper having the shape and size of the printing or other graphic material on to the copy sheet.

Although there is a conflict in the testimony as to whether the transfer of the printed or graphic image takes place before or upon the separation of the two sheets, it would seem that the evidence fairly sustains defendant's position in this regard, to wit, that the transfer of the wax images from the carbon sheet to the copy sheet is effected when there is manual removal by the peeling away of the carbon sheet. In that defendant follows Miller's teaching in utilizing an instant and intense heat in order to create a heat differential so that the graphic images would absorb more heat than the paper on which they appear and thus reproduce the images by means of a carbon waxy sheet, one might conclude that the defendant has pursued a "Method of Using Heat-Sensitive Copying Paper," which is the title of the Miller patent. But defendant does not use a copy sheet in its method which is capable of undergoing a visible color change when exposed to radiant energy. In defendant's method, copies are produced as the result of a transfer of the graphic materials by an entirely different process. There is no heat-sensitive copy sheet which undergoes a color change. Instead, the heat differential pattern produced by defendant's method results in a transfer of the waxy graphic images on to a separate sheet of paper. Plaintiff admits in its brief that

neither defendant's carbon waxy paper nor the Masterfax paper used in connection therewith are heat-sensitive copy sheets of themselves, but contends that the two of them when associated together in producing copies constitute an equivalent of the Miller method. However, as Miller pointed out to the Patent Examiner, his particular heat-sensitive sheet material has critical limitations within the broad scope of the prior art.

When Miller filed his patent application on May 10, 1947, he attempted to obtain a patent on his heat-sensitive sheets. These proposed heat-sensitive sheets were incorporated in Claims 11 to 14, inclusive. Claim 11 may be cited as illustrative of these sheets:

"As a new article of manufacture suitable for use in the copying of printed matter by a rapid direct process involving only the application of intense radiant energy as herein described, a thin sheet material comprising a support member carrying a firmly bonded thin coating comprising solid particles of coloring-matter uniformly interspersed throughout a layer of particles of a waxy material melting at a temperature within the range of about 50°–150° C."

In his remarks as to his proposed Claims 11 to 14, inclusive, Miller stated that they are "specific to a structure as illustrated by Example 3 of the specification, and will be seen to be entirely distinct from the specific structure of the prior art." And later (page 32, File Wrapper), "New claims 11–14 define the heat-sensitive coating in terms of well-recognized materials exemplified by the materials of the composition of Example 3." This reads:

"Thin unsized flax paper was coated and impregnated with a mixture of finely divided dispersed particles of methylene blue and of mercuric stearate in axylol solution of ethyl cellulose. On drying, the sheet was quite transparent, e. g., when the sheet was held in contact with a printed page, the printing could be

seen through the sheet; it had a faint blue color, and was unchanged on prolonged exposure to light. When used as a transparent heat-sensitive copying-paper, it produced an intense blue facsimile copy of the graphic original. The sheet was most satisfactorily exposed with the coated surface in contact with the original printed page, but usefully clear and exact copies could alternatively be prepared with the untreated surface in contact with such original, or even with the copying-paper suitably supported against the reverse side of the printed page. In this last-named modification, the thickness of the web supporting the heat-sensitive surface coating could be considerably increased.

"The use of these or other heat-sensitive compositions, together with suitable transparent binders or carriers where desired, as coatings on various transparent base sheet materials or in self-sustaining films is also contemplated.

"Specific examples of transparent copying papers and of methods for their use in the preparation of facsimile copies of graphic subject-matter have been given, together with a discussion of the principles involved, all in a manner designed to render the invention fully understandable to those skilled in the art. It will be understood that all equivalent modifications are likewise apprehended."

As to his claims on his heat-sensitive sheets, Miller was met with the Examiner's reference to Newman patent 2,-519,321, applied for April 25, 1946, and issued August 15, 1950, and the British patent of Francis, 379,333, issued August 23, 1932, which patents allegedly showed a reproduction of graphic images by the utilization of heat-sensitive sheets. Thereupon, Miller in pointing to the difference between his heat-sensitive sheets and those of Newman and Francis, made this statement (page 41, File Wrapper):

"Newman and Francis are each concerned with the production of waxy transfer sheets, such as the well-known carbon paper employed in making multiple copies on the typewriter. In making such transfer sheets, these patentees apply to the paper backing liquid compositions consisting of wax or resin, oils or other plasticizers, and coloring agent. The coating is then heated. The resulting waxy layer is 'transferable by pressure'; Francis patent, page 1, line 15. The waxy component of said layer is in continuous film form, *not* in the form of particles as specified in applicant's claims. Since the wax oil-color compositions of Newman and of Francis, as they appear in the final transfer sheet, have already been heated and the wax-oil mixture melted and blended together, it is apparent that subsequent heating can produce no visible change. Hence the transfer sheet or carbon-paper products provided by the patentees would be of no value as heat-sensitive copying-papers in applicant's process."

█ Although the applicability of the so-called doctrine of file wrapper estoppel may not be strictly applicable herein, in that Miller subsequently abandoned his patent claims 11 to 14, it must necessarily follow that the inventor's own interpretation of the heat-sensitive paper which he used, as distinguished from Newman and Francis, is evidence which is strikingly material herein; that is, the inventor's own distinction between the heat-sensitive paper he used and that which is now used by the alleged infringer, when there was no infringement suit pending, must be given due weight.

In speaking of his heat-sensitive paper, Claims 11 to 14, Miller stated in his brief before the Board of Patent Appeals that

"The product is suitable for the intended use because it is capable of permanently visibly changing when heated to the proper temperature, within the range obtainable by the method indicated. The change is due, as previously explained, to the

melting and coalescing of the waxy particles of the firmly bonded coating, and the resultant change in appearance of the heated area. Note that the entire coating is, and remains, 'firmly bonded' to the support."

But as to the Newman and Francis product, he states,

"Such a product must release or transfer a portion of its waxy coating to the underlying paper in order to provide the desired copy. The waxy surface is visibly modified only by removal of a portion of the coating."

And later,

"Neither Newman nor Francis, therefore, in any way teach the preparation of a sheet material suitable for the copying of printed matter in the manner taught by the applicant."

The carbon paper used by the defendant is entirely comparable to that used by Newman and Francis. Certainly, defendant's paper is "not capable of visible changes when heated to the proper temperature." In describing the Newman and Francis paper, Miller specifically calls to the attention of the Board of Appeals of the Patent Office that the waxy surface in Newman and Francis, just as in defendant's carbon wax paper, is "visibly modified only by removal of a portion of the coating." The only change in defendant's couplet in making a copy is the transfer of the sticky wax images to the copy sheet. And the reproduction is not only due to the heat differential produced as between the graphic original and the paper on which the images appear, but also to the pressure in the Ditto machine which is substantially higher than that employed in the Thermofax machine.

The doctrine of equivalency would be extended beyond reasonable limits if defendant's method of reproducing graphic originals is held to infringe the teachings of plaintiff's patent. The wax face surface of defendant's carbon paper is always maintained in direct contact with the surface of the associated copying paper. The heat of the graphic original caused by radiant energy does not cause a reproduction on heat-sensitive paper which is capable of undergoing a color change when exposed to heat. Rather, in defendant's process, the heat of the graphic original is conveyed to the waxy composition of the carbon whereby there is a softening of the wax to the degree that the graphic images are impressed upon the waxy carbon to the extent that there is an adherence between the two sheets which, upon being separated, results in the wax in the shape of the images being transferred or offset to the associated copy. It is the heat and the pressure which effect defendant's results.

It is Figures 1, 2, 3, 4, 5 and 6 of Exhibit 16–a which illustrate defendant's method of producing a graphic original. The wax carbon process in Figures 1, 2 and 3 of Exhibit 16–a has an ink which enables the copy to be utilized with a so-called Spirit copying machine. The procedure as illustrated in Figure 4 contemplates the picking up of ink from an inking roll. It is only the procedure in Figures 5 and 6 of Exhibit 16–a which has carbon adapted for the making of copies in the Masterfax machine.

The sheet material used by the defendant is fully comparable to that introduced by Newman and Francis, as well as the Mayer patent, 1,783,442, and hence the Court concludes that in that defendant does not employ transfer sheets which produce a visible change when subjected to the copying process of the Masterfax machine, and in that Miller recognized that distinction when his heat-sensitive sheet claims were before the Patent Office, and in light of all of the evidence, the Court finds that plaintiff has not sustained the burden of establishing an equivalency in defendant's methods which will constitute an infringement. The Court has given due consideration to the fact that Claim 9 of the Miller patent may be considered broader in its scope than the other claims by reason of the language utilized. How-

ever, in view of the file wrapper history, one cannot escape the clear intent of the patentee to teach the use of a copying sheet capable of undergoing a visible change in color when heated. Defendant's copying sheets do not equate with this teaching.

Findings of fact, conclusions of law and order for judgment may be presented to this Court on May 13, 1963, at ten o'clock A.M.

Exceptions are reserved.