AMERICAN INFRA-RED RADIANT CO., Inc., a Delaware corporation, and Hupp Corporation, a Virginia corporation, Plaintiffs,

v.

LAMBERT INDUSTRIES, INC., a Minnesota corporation, and Industrial Ceramics, Inc., a Minnesota corporation, Defendants,

and

Agard L. Lambert, Nominal Party Defendant.

Civ. No. 5–61–51.

United States District Court
D. Minnesota,
Fifth Division.

Jan. 20, 1965.

See also D.C., 32 F.R.D. 372.

Wheeler, Burns & Buchanan, by Herbert M. Burns, Duluth, Minn., Strauch, Nolan & Neale, by Wm. A. Strauch and J. M. Neale, Washington, D. C., for plaintiffs.

Merchant, Merchant & Gould, by John D. Gould, Minneapolis, Minn., for defendants.

DONOVAN, District Judge.

This is a patent infringement suit. Plaintiffs seek to enjoin infringement

by defendants and demand damages and other relief. Defendants deny liability and allege estoppel and invalidity of the letters patent, and by counterclaim demand a declaratory judgment in their favor.

The complaint identifies the respective parties and then by allegations commendably brief and clear states the cause of action, as follows:

"4. This action arises under the patent laws of the United States, Title 35 U.S. [C] 271 and 281 et seq. This Court has jurisdiction under Title 28, U.S.C. 1338. Venue is based on Title 28, 1400b.

"5. On December 25, 1956 Letters Patent of the United States No. 2775294 were duly and regularly issued to plaintiff, American Infra-Red Radiant Co., Inc. for an invention in RADIATION BURNERS and since that date said plaintiff has been and still is the owner of said Letters Patent.

"6. On January 27, 1959 Letters Patent of the United States No. 2870830 were duly and regularly issued to plaintiff, American Infra-Red Radiant Co., Inc. for an invention in GAS BURNERS and since that date said plaintiff has been and still is the owner of said Letters Patent.

"7. By agreement effective July 1, 1956 and presently effective, plaintiff Hupp Corporation became the licensee of plaintiff American Infra-Red Radiant Co., Inc., under the aforesaid Letters Patent Nos. 2775294 and 2870830, and acquired the right to sue for infringement of said Letters Patent.

"8. Defendant has been and still is infringing said Letters Patent Nos. 2775294 and 2870830 by making, selling and using or causing to be made, sold and used within the Fifth Division of this Judicial Circuit and elsewhere in the United States burners and components embodying the patented inventions and will continue to do so unless enjoined by this Court.

"9. Defendant has persisted in said infringement with actual knowledge of plaintiff's patent rights and has infringed said Letters Patent deliberately and wilfully.

"10. Plaintiff Hupp Corporation has sold substantial quantities of burners embodying the patented inventions of the aforesaid Letters Patent Nos. 2775294 and 2870830, and since shortly after their issue dates has applied the statutory notice to said burners as provided for in 35 USC 287."

The answer admits paragraphs 3 and 4 of the complaint and the issuance of the letters patent, denies all other allegations of the complaint and leaves plaintiffs to their proof thereof. Defendants' specific allegation of invalidity of the patents in suit is based on anticipation and on not meeting the conditions for patentability over the prior art.[1]

The radiation burner patent will be referred to as the 294, and the gas burner patent will be referred to as the 830. They are sometimes referred to in the evidence as the "Schwank Patents."

It is undisputed that patents 294 and 830 were issued and that plaintiff American Infra-Red Radiant Co., Inc. (herein referred to as Infra-Red) is the present owner of said patents, and that Hupp Corporation (herein referred to as Hupp) is a licensee of Infra-Red with the right to file and prosecute the instant case.

▉ In a suit for infringement of a patent, it is not a part of plaintiff's case to negative prior publication or prior use or the other matters of affirmative defense. The answer is the appropriate place to plead such, thereby assuming the affirmative. Counsel for plaintiffs and defendants have conformed to the foregoing requirement. As pointed out by Chief Justice Hughes, it has long been

1. Mumm v. Joseph E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983.

the law that " ' * * * the grant of letters patent is *prima facie* evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty.' * * * Hence, the burden of proving want of novelty is upon him who avers it. * * * Not only is the burden to make good this defense upon the party setting it up, but *his burden is a heavy one*, as it has been held that 'every reasonable doubt should be resolved against him.' " [2] [Emphasis supplied.]

Pleadings, pre-trial procedure, the transcript of trial, briefs, and oral arguments outline the issues herein, as follows:

1. Are the patents in suit valid?

2. If found by the Court to be valid, have defendants infringed them?

3. If found valid and infringed, are plaintiffs estopped by misuse of said patents?

4. Have plaintiffs violated the antitrust laws of the United States?

The trial record is voluminous and the exhibits numerous. Summarized, all of this has to do with the patent claims of 294 and 830 reproduced herewith:

Patent 294—

"I claim:

"1. A burner member, comprising a block of refractory material provided with passages therethrough for a combustible fuel mixture, said passages being substantially uniformly distributed throughout a portion of the area of said block and each having a cross sectional area of not more than about four square millimeters and a length not less than about five millimeters and each extending substantially in the same direction throughout its length from one side of the block to the outer side thereof, said passages collectively occupying not less than about 20 percent of the total radiation area at said outer side of the block, said block of re-fractory material having a heat-retarding medium of substantially lower thermal-conductivity than said refractory material distributed therein to reduce the thermal-conductivity of the block, the latter having a thermal-conductivity of less than 0.5 kilocal./hr. m. °C., said passages being defined by integral internal wall surfaces of said block and said heat-retarding medium being disposed adjacent to said passage-defining surfaces, said passage arrangement and dimensions and said heat-retarding medium in said block and adjacent to said internal wall surfaces of said passages being jointly operable to confine the combustion of the fuel mixture to the outer zone of said passages and to inhibit said combustion from traveling in said passages inwardly of said zone and producing a back-firing effect.

"2. A burner member, comprising a block of refractory material provided with passages therethrough for a combustible fuel mixture, said passages being substantially uniformly distributed throughout a portion of the area of said block and each having a cross sectional area of not more than about four square millimeters and a length not less than about five millimeters and each extending substantially in the same direction throughout its length from one side of the block to the outer side thereof, said passages collectively occupying not less than about 20 percent of the total radiation area at said outer side of the block, said block of refractory material having a heat-retarding medium of substantially lower thermal-conductivity than said refractory material distributed therein to reduce the thermal-conductivity of the block, the latter having a thermal-conductivity of less than 0.5 kilocal./hr. m. °C., said passages being defined by integral internal wall

---

2. Mumm v. Joseph E. Decker & Sons, supra note 1.

surfaces of said block and said heat-retarding medium being disposed adjacent to said passage-defining surfaces, said passage arrangement and dimensions and said heat-retarding medium in said block and adjacent to said internal wall surfaces of said passages being jointly operable to confine the combustion of the fuel mixture to the outer zone of said passages and to inhibit said combustion from traveling in said passages inwardly of said zone and producing a backfiring effect and a metal oxide incorporated in said refractory material to increase the heat radiation properties thereof.

"3. A burner member, comprising a block of refractory material provided with passages therethrough for a combustible fuel mixture, said passages being substantially uniformly distributed throughout a portion of the area of said block and each having a cross sectional area of not more than about four square millimeters and a length not less than about five millimeters and each extending substantially in the same direction throughout its length from one side of the block to the outer side thereof, said passages collectively occupying not less than about 20 percent of the total radiation area at said outer side of the block, said block of refractory material comprising essentially a clay material having a heat-retarding medium of substantially lower thermal-conductivity than said clay material distributed therein to reduce the thermal-conductivity of the block, said passages being defined by integral internal wall surfaces of said block and said heat-retarding medium being disposed adjacent to said passage-defining surfaces, said passage arrangement and dimensions and said heat-retarding medium in said clay material block and adjacent to said internal wall surfaces of said passages being jointly operable to confine the com-

bustion of the fuel mixture to the outer zone of said passages and to inhibit said combustion from traveling in said passages inwardly of said zone and producing a backfiring effect.

"4. A burner member, comprising a block of refractory material provided with passages therethrough for a combustible fuel mixture, said passages being substantially uniformly distributed throughout a portion of the area of said block and each having a cross sectional area of not more than about four square millimeters and a length not less than about five millimeters and each extending substantially in the same direction throughout its length from one side of the block to the outer side thereof, said passages collectively occupying not less than about 20 percent of the total radiation area at said outer side of the block, said block of refractory material comprising essentially a clay material having a heat-retarding medium of substantially lower thermal-conductivity than said clay material distributed therein to reduce the thermal-conductivity of the block, said heat-retarding medium comprising a multiplicity of minute isolated gas filled cavities distributed throughout said clay material block, said passages being defined by integral internal wall surfaces of said block and said heat-retarding medium being disposed adjacent to said passage defining surfaces, said passage arrangement and dimensions and said heat-retarding medium in said clay material block and adjacent to said internal wall surfaces of said passages being jointly operable to confine the combustion of the fuel mixture to the outer zone of said passages and to inhibit said combustion from traveling in said passages inwardly of said zone and producing a backfiring effect.

"5. A gas burner device, comprising a burner casing defining a

chamber having an open part and fuel and air inlet means to said chamber, a burner member disposed at said open part and forming a closure thereat, said burner member comprising a block of refractory material having a multiplicity of passages therethrough for a combustible fuel and air mixture, said passages being substantially uniformly distributed throughout an area of said block and each having a cross sectional area of not more than about four square millimeters and a length not less than about five millimeters and each extending substantially in the same direction throughout its length from the inner face of the block to the outer face thereof, said passages collectively occupying not less than about 20 percent of the total radiation area at said outer face of the block, said block of refractory material having a heat-retarding medium of substantially lower thermal-conductivity than said refractory material distributed therein to reduce the thermal-conductivity of the block with the latter having a thermal conductivity of less than 0.5 kilocal./hr. m. °C. and defining a radiant surface on the outer face thereof to be rendered incandescent by the combustion of fuel and air supplied to the inner face thereof, said passages being defined by integral internal wall surfaces of said block and said heat-retarding medium being disposed adjacent to said passage-defining surfaces, said passage arrangement and dimensions and said heat-retarding medium in said block and adjacent to said internal wall surfaces of said passages being jointly operable to confine the combustion of fuel and air to the outer zone of said passages and to inhibit said combustion from traveling in said passages inwardly of said zone and producing a backfiring effect."

Patent 830:

"What is claimed is:

"1. In a gas burner, a dish-shaped body member having opposite side walls, opposite end walls and a bottom wall defining a mixing chamber in which gaseous fuel and air are mixed prior to combustion, a mixing tube disposed in said mixing chamber and having an inlet adjacent one of said end walls, said mixing tube extending toward the opposite end wall and having an outlet in communication with said chamber at a point remote from said one end wall and nearer to said opposite end wall than to said one end wall, said side walls confronting the opposite sides, respectively, of said mixing tube, and defining the maximum width of said dish-shaped body, each side wall being spaced a substantial distance from the confronting side, respectively, of the mixing tube, a nozzle in fluid communication with said mixing tube for supplying fuel to the latter, air inlet means in fluid communication with said mixing tube and nozzle for supplying air to said mixing tube responsive to the flow of fuel from said nozzle into said tube, said dish-shaped body having a flat planar opening substantially coextensive in area with said dish-shaped body between said opposite side walls and said opposite end walls thereof, and flat fuel-outlet burner means mounted on said body adjacent said mixing tube and covering said opening, said flat fuel-outlet burner means having its opposite surfaces of maximum area disposed parallel to said planar opening of the dish-shaped body member, the depth of said dish-shaped body between said bottom wall and said flat fuel-outlet burner means being not substantially greater than the diameter of said mixing tube.

"2. In a gas burner, a dish-shaped body member having opposite side walls, opposite end walls and a bottom wall defining a mixing

chamber in which gaseous fuel and air are mixed prior to combustion, a m˙ ɟ tube disposed in said mixing chamber and having an inlet adjacent one of said end walls, said mixing tube extending toward the opposite end wall and having an outlet in communication with said chamber, said side walls confronting the opposite sides, respectively, of said mixing tube, and defining the maximum width of said dish-shaped body, each side wall being spaced a substantial distance from the confronting side, respectively, of the mixing tube, a nozzle in fluid communication with said mixing tube for supplying fuel to the latter, air inlet means in fluid communication with said mixing tube and nozzle for supplying air to said mixing tube responsive to the flow of fuel from said nozzle into said tube, said dish-shaped body having a flat planar opening substantially coextensive in area with said dish-shaped body between said opposite side walls and said opposite end walls thereof, and flat fuel-outlet burner means mounted on said body adjacent said mixing tube and covering said opening, said flat fuel-outlet burner means having its opposite surfaces of maximum area disposed parallel to said planar opening of the dish-shaped body member, the depth of said dish-shaped body between said bottom wall and said flat fuel-outlet burner means being not substantially greater than the diameter of said mixing tube, said dish-shaped body member having an internal part extending between said side walls adjacent the said opposite end wall and provided with surface portions disposed transversely of the longitudinal axis of said mixing tube and confronting said outlet opening of said mixing tube for directing the fuel and air issuing from said outlet opening in a direction of flow externally of said mixing tube extending from said surface portions toward the said one end wall of said dish-shaped body.

"3. In a gas burner, a dish-shaped body member having opposite side walls, opposite end walls and a bottom wall defining a mixing chamber in which gaseous fuel and air are mixed prior to combustion, a mixing tube disposed in said mixing chamber and having an inlet adjacent one of said end walls and an outlet in fluid communication with said chamber adjacent the opposite end wall thereof, said side walls confronting the opposite sides, respectively, of said mixing tube and said mixing tube being positioned substantially midway between said side walls laterally thereof, said side walls defining the maximum width of said dish-shaped body, each side wall being spaced from the confronting side, respectively, of the mixing tube, a distance not substantially less than the radius of said mixing tube, a nozzle in fluid communication with said mixing tube for supplying fuel to the latter, air inlet means in fluid communication with said mixing tube and nozzle for supplying air to said mixing tube responsive to the flow of fuel from said nozzle into said tube, said dish-shaped body having a flat planar opening substantially coextensive in area with said dish-shaped body between said opposite side walls and said opposite end walls thereof, and flat fuel-outlet burner means mounted on said body adjacent said mixing tube and covering said opening, said flat fuel-outlet burner means having its opposite surfaces of maximum area disposed parallel to said planar opening of the dish-shaped body member, said outlet opening and said burner means being substantially coextensive and being disposed adjacent one side of said mixing tube, the depth of said dish-shaped body member between said bottom wall and said flat fuel-outlet burner

means being not substantially greater than the diameter of said mixing tube.

"4. In a gas burner, a · dish-shaped body member having opposite side walls, opposite end walls and a bottom wall defining a mixing chamber in which gaseous fuel and air are mixed prior to combustion, a mixing tube disposed in said mixing chamber and having an inlet adjacent one of said end walls and an outlet in fluid communication with said chamber adjacent the opposite end wall thereof, said side walls confronting the opposite sides, respectively, of said mixing tube and said mixing tube being positioned substantially midway between said side walls laterally thereof, said side walls defining the maximum width of said dish-shaped body, each side wall being spaced from the confronting side, respectively, of the mixing tube, a distance not substantially less than the radius of said mixing tube, a nozzle in fluid communication with said mixing tube for supplying fuel to the latter, air inlet means in fluid communications with said mixing tube and nozzle for supplying air to said mixing tube responsive to the flow of fuel from said nozzle into said tube, said dish-shaped body having a flat planar opening substantially coextensive in area with said dish-shaped body between said opposite side walls and said opposite end walls thereof, and flat fuel-outlet burner means mounted on said body adjacent said mixing tube and covering said opening, said flat fuel-outlet burner means having its opposite surfaces of maximum area disposed parallel to said planar opening of the dish-shaped body member, said outlet opening and said burner means being substantially coextensive and being disposed adjacent one side of said mixing tube, the depth of said dish-shaped body member between said bottom wall and said flat fuel-outlet burner means being not substantially greater than the diameter of said mixing tube, said dish-shaped body member having an internal part extending between said side walls adjacent the said opposite end wall and provided with surface portions disposed transversely of the longitudinal axis of said mixing tube and confronting said outlet opening of said mixing tube, for directing the fuel and air issuing from said outlet opening in a direction of flow externally of said mixing tube extending from said surface portion toward the said one end wall of said dish-shaped body."

█ Descriptions in claims for a patent, such as those last quoted, are not addressed to the public generally, or to lawyers, or to judges, but to those skilled in the art to which the invention pertains, or with which it is most nearly connected, and hence sufficiency of such claims must be tested in light of such claimed facts and be judged by what it conveys to those skilled in the art. This necessitates recourse to experts such as were called by the parties in the case at bar. Their problem was to clarify the claims and the issues raised so the trier of the facts may be able to comprehend and not be confused and confounded by the testimony of such witnesses learned in the art, but who arrive at contradictory conclusions based upon the facts in evidence.

█ It would extend this Court's discussion beyond reasonable limits to summarize the facts one may select in a fragmentary manner from the 1,871 pages of the official court reporter's transcript of the trial of the instant case. Suffice to say, the claims speak for themselves. They portray the facts upon which plaintiffs rely. They are the sole measure of the grant of the patents.[3] Defendant Lambert was in the employ

3. Aero Mfg. Co. v. Convertible Top Co., 365 U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592.

of plaintiffs for a considerable period of time before he organized defendants' business. He is president and a director of each corporate defendant.

Plaintiffs' expert witnesses (to mention a few) Konrade Bauer, research engineer, Clarence Fishleigh, consulting engineer, and Professor Adolph O. Lee of the University of Minnesota, testified in support of validity of the patents in suit, distinguishing them from McCourt and emphasizing plaintiffs' claim of infringement by defendants.

Defendants' witnesses included Frederick E. Lange, an experienced patent lawyer, Charles J. Twine, an expert on ceramics, and Thomas C. Carson, an electrical and gas engineer, all of whom constituted a formidable array of experts, who expressed opinions supporting opposite conclusions, material to decision on the merits in the case at bar.

The pleadings, pre-trial procedure as disclosed by the clerk's file and file wrapper of the patents in suit, augmented by the trial transcript, briefs, and oral argument, are directed at the issues above named.

1. Are the patents in suit valid?

 Consideration of the problem of validity leads to the genesis of patentability.

Title 35, United States Code, §§ 102 and 103 provide:

"Sec. 102. A person shall be entitled to a patent unless—

* * * * * *

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in United States * * *.

"Sec. 103. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * "

Defendants in support of their claim of invalidity place considerable reliance on the prior art. Expert witnesses Fishleigh for plaintiffs and Lange for defendants used explanatory charts to support their testimony having to do with comparisons of the patents in suit with the so-called McCourt patent upon which defendants base their defense of anticipation and prior art. Defendants contend that failure of the patent office and its examiner to refer to McCourt is indicative that the patent office lacked knowledge thereof. However, the failure of the examiner to refer to McCourt is not the first time the prior art has been overlooked by the patent office in matters pertaining to patents in suit and the prior art. A foreign patent must disclose invention without resort to experimentation. The test of clarity of the claims is important.[4]

 The question of validity and its accompanying presumption must be considered a matter of prime importance.[5] The public, as a matter of course, is vitally interested too in the sense that the grant of a patent is the grant of a statutory monopoly. Genius, prior art, mechanical skill, and the faculty of invention, leading to patentability, are questions of fact.

4. Hall Laboratories v. Economics Laboratory, 8 Cir., 169 F.2d 65; Wisconsin Alumni R. Foundation v. George A. Breon & Co., 8 Cir., 85 F.2d 166; see also: Anderson Company v. Sears, Roebuck and Co., 7 Cir., 265 F.2d 755, 761.

5. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 229, 84 S.Ct. 784, 11 L.Ed.2d 661; Sinclair Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; Briggs & Stratton Corporation v. Clinton Machine Co., 8 Cir., 247 F.2d 397; Lorenz v. General Steel Products Company, 5 Cir., 337 F.2d 726; Tillotson Manufacturing Co. v. Textron, Inc., Homelite, 6 Cir., 337 F.2d 833.

If able and distinguished experts in this particular field cannot agree as to the teachings of Schwank and McCourt, it may be understandable that the trial court performs as best it may in its attempt to determine which of the litigants has produced the most convincing analysis and interpretation of a rather vexing problem.[6]

As declared by the court, supra, the patents in suit are presumed valid. The heavy burden of rebutting the presumption of validity rests upon the defendants and the question whether the patents constitute an invention is for the trier of the facts and law in the case at bar. Evidence of commercial success in a doubtful case may turn the scale in favor of the patentee. Where, as here, the patents for the first time produced a commercially successful and commercially acceptable device made up of elements providing uniform incandescence to maintain commercially acceptable temperatures of 1500 to 1700 degrees Fahrenheit, it constitutes novelty. As between validity on the one hand and invalidity on the other hand, the presumption prevails unless the trial court finds the defendants' required heavy burden of proof has, by competent evidence, overcome the presumption of validity.[7]

Many authorities of respectable standing have been cited by counsel for plaintiffs and defendants supporting the contentions of counsel who cite them. Such authorities, in the words of Mr. Justice Holmes, "exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." [8]

Circumstances alter cases. The instant case is one needing to be decided on facts not identical to those cases relied on by counsel in their briefs. The comparison charts in evidence, as discussed by witnesses under oath, and the demonstrations of performance by the patents in suit with defendants' alleged infringement, all as portrayed by the transcript on file in the clerk's office, have been helpful to the trier of the facts in disposing of the issues involved.

The mere fact, however, that some of the elements in patents 294 and 830 are found in the prior art does not of itself mean said patents are invalid; such disclosure serves notice of necessity for close study and greater care in arriving at the conclusion of validity based upon established legal standards.

The quality of the patentee's product is dependent upon disclosure of advances in knowledge beneficial to society. Plaintiffs' claims are patentable despite the prior McCourt apparatus which, with modification and resort to equivalents, may crudely demonstrate the future accomplishment exemplified by the patents in suit. The expert testimony and the history of the patents here challenged by defendants, together with comparisons by charts in evidence and demonstrations carried on by respective counsel's witnesses during trial, convince me that patents 294 and 830 were not anticipated within the letter of controlling law by the prior art or McCourt. Prior effort and failure are not unusual. Such has been the course of history. A new combination resulting in improved construction which brings forth a new and more efficient result than prior art

6. Ditto, Inc., v. Minnesota Mining & Manufacturing Co., D.C.Minn., 221 F.Supp. 980, 985—affirmed 336 F.2d 67; Hughes Tool Co. v. Varel Manufacturing Co., 5 Cir., 336 F.2d 61.

7. Title 35 U.S.C.A. § 282; see also: Mumm v. Decker & Sons, supra note 1; Calmar, Inc. v. Cook Chemical Co., 8 Cir., 336 F.2d 110; John Deere Company of Kansas City v. Graham, 8 Cir., 333 F.2d 529; Wm. F. Crome & Company v. The Vendo Company, 8 Cir., 299 F.2d 852.

8. Northern Securities Co. v. United States, 193 U.S. 197, 401, 24 S.Ct. 436, 48 L. Ed. 679; see also: Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Graver Tank & Mfg. Co. v. Linde Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Radio Corp. v. Radio etc., Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.

devices is patentable. Industry by the patentee plus public acceptance of the patented product, as disclosed by the record of the instant case, are factually convincing of genius, novelty, and invention. After much thought, deliberation, and research, the Court concludes the patents in suit to be valid.

Having concluded said patents valid, consideration will now be given the next issue.

2. Have defendants infringed patents 294 and 830? The measure of recovery for patent infringement is governed by Title 35 United States Code § 284 providing for damages only.

 In determining whether defendants' accused product infringes a valid patent, resort must be had in the first instance to the wording of the claims relied on by plaintiffs.[9] If the accused matter is within said claims, infringement may be made out under the doctrine of equivalents. That which is not literally within the claims does not infringe. It resolves itself into a question of degree of invention. The tests and performances made in open court demonstrate McCourt so relatively inferior in claim and performance to the patents in suit as not to constitute infringement.[10] Disclaimer, file wrapper estoppel, monopoly, and all briefs submitted, including those of defendants received on December 2, 1964, have been weighed and considered together with all related subjects and may be disposed of by the holding of this Court that the patents in suit, as compared to defendants' accused device, are so substantially dissimilar in thought, construction, form, and performance as to require a finding in fact and law as not constituting infringement in the present case. I so hold.

3. Should defendants prevail on their counterclaim?

 Without repeating much that has been said supra, I am satisfied that plaintiffs are not guilty of misuse of the patents in suit and find no evidence in the record of the case at bar indicating control of items or matters within the scope of said patents supporting defendants' claim that plaintiffs engaged in conspiracy to the damage of defendants.

The Court has considered defendants' briefs received December 2, 1964, on the counterclaim pleaded on "validity issues" and "counterclaim" and concludes that there has been a failure of proof required to establish actionable violation of the Sherman[11] and Clayton [12] Acts of Congress that would permit awarding damages to defendants. The record and burden of proof on defendants in the instant case do not measure up to credible evidence of proof of misuse.[13] Damages must be proved beyond the evidence submitted and relied on by defendants in the case at bar under the Sherman and Clayton Acts.[14]

Findings of fact, conclusions of law, order for and form of judgment consistent with the foregoing may be presented in this court on February 19, 1965, at ten o'clock a. m., Federal Building, Duluth, Minnesota.

Exceptions are reserved.

9. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

10. Graver Tank Mfg. Co. v. Linde Co., supra note 8; Parmelee Pharmaceutical Company v. Zink, 8 Cir., 285 F.2d 465; for pertinent history of patent law, see: Sears, Roebuck & Co. v. Stiffel Co., supra note 5; Henriksen v. Cory Corporation, 7 Cir., 327 F.2d 409; Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751.

11. Title 15 U.S.C.A. §§ 1 through 7.

12. Title 15 U.S.C.A. §§ 12 through 27, 44; John Wright & Associates, Inc. v. Ullrich, 8 Cir., 328 F.2d 474, and cases cited.

13. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed. 2d 580.

14. Duff v. Kansas City Star Company, 8 Cir., 299 F.2d 320.