## SPECIAL EQUIPMENT CO. *v.* COE, COMMISSIONER OF PATENTS.

No. 469. Argued March 2, 5, 1945.—Decided March 26, 1945.

*Messrs. Clarence J. Loftus* and *Curtis F. Prangley,* with whom *Messrs. James Ballard Moore* and *James M. Graves* were on the brief, for petitioner.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy, Messrs. Robert L. Stern* and *Abraham J. Harris* were on the brief, for respondent.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

This is a suit in equity, brought in the District Court of the District of Columbia, under R. S. § 4915, to compel respondent, the Commissioner of Patents, to issue a patent upon an application for a subcombination of the elements of a machine for which the inventor had previously filed a patent application. The district court gave judgment for respondent. The Court of Appeals for the District affirmed, 144 F. 2d 497, and we granted certiorari, 323 U. S. 697. The question is whether the Court of Appeals correctly rested its decision upon the ground that petitioner did not intend to make or use the invention and that the purpose of seeking the patent was to exploit and protect the combination invention embodied in the complete machine, of which the subcombination is a part.

Ewald, the plaintiff in the district court in whose stead petitioner, his assignee, was later substituted as a party, made application for a patent on a "fruit-treating apparatus" embracing the combination embodied in his complete machine. Certain claims of his application were allowed October 27, 1938, but a patent has not yet issued. The following year he made a renewed application for the subcombination, with which the present suit is concerned. The specifications of the original application disclosed mechanisms for automatically performing the successive operations of bobbing (cutting off the stems), splitting, paring, and coring pears, in preparation for canning or other processing.

The original application specified and claimed an apparatus consisting of two spaced, horizontally mounted turrets or turntables, combined with means for continuously, but intermittently, rotating both in the same direction. Fixed upon and rotatable with the table of the first turret are a plurality of pear receiving and clamping means, spaced upon the upper surface of the turntable, adapted to receive and clamp either a pre-split or a whole pear. At the first intermittent stop a swinging knife shears off (bobs) the stem of the fruit, which extends beyond the clamps. At the next intermittent stop, overhead traveling jaws or clamps grasp the fruit concurrently with its release from the first clamp and carry the fruit longitudinally to a point over the second turntable.

As the pear is thus carried from the first turret to a position over the second, it is split by a fixed vertically positioned knife straddled by the overhead traveling clamps. As the clamps force the pear against and past the knife, it cleaves the pear into substantially equal half sections. The pear sections are then automatically, successively deposited in spaced cups fixed on the second revolving turntable. At the next stop of that turntable the pear section resting in its cup is peeled by an automatically

operated paring knife. At the next successive stop the core is removed from the pear section by an automatically operated coring device. After completing the coring, the mechanism automatically separates the pear section from the core and the peeling and discharges them and the pear section into appropriate receptacles.

In the operation of the machine whole or split pears may be fed by hand to the holding and clamping devices on the first turret where the pears are bobbed. The whole pear is then split as it is carried by the overhanging jaws from the first turret to the second. The peeling and coring of both pre-split and whole pears are then carried through by the operation of the second turret.

The patent application for the complete machine discloses a highly ingenious device, which is said to have achieved a great advance in the art by increasing the speed and skill with which pears are prepared for canning, and to result in a great saving of manpower. The renewed application for the subcombination specifies and claims the apparatus which we have described but without the splitting knife. In the operation of the device thus claimed the pears are pre-split by hand. The split sections are placed face to face in the receiving and clamping means upon the first turntable, after which the operation, except the splitting by the splitting knife, proceeds in exactly the same way and accomplishes the same result as when the splitting knife is present.

Additional claims, which are those sued on, covering all the elements of the combination except the splitting knife, were duly presented to the Patent Office. There they were rejected as incomplete, broader than the invention disclosed by the petitioner in his application, and misleading, and as covering constructions not contemplated by petitioner's application. Respondent Commissioner, alleging no prior art against the allowance of the claims, set up these objections in his answer in the district court as the

sole grounds of defense to the suit. The district court sustained the Commissioner on the grounds assigned by him for rejection of the claims, and for the further reason that the subcombination claims did not "combine to produce any useful result."

The Court of Appeals, after observing the operation of petitioner's subcombination without the cutting knife, as shown by moving pictures, concluded that the device was far more useful in its operation than the old method of preparing fruit by hand, and, without deciding the point, added that it was plausible to say "that two distinct inventions are disclosed in the application."

Without further examination of the issues raised by the pleadings, it affirmed the judgment of the district court upon the new and independent ground that a patent on the subcombination should not be granted because of "the dangers of approving a principle which permits a patent monopoly to be extended by granting claims on distinct inventions, which the applicant has no intention of exploiting as distinct inventions." It said: "The record shows that it [the subcombination patent] is to be used to exploit and protect the patent monopoly of another related invention, to-wit: the complete machine. There is no intention to make or license others to make the partial machine because, although it is possible to use it without the cutting knife, it is not designed for such independent use." It thought that the grant of a patent which the patentee has no intention of exploiting as a distinct invention "for the purpose of blocking the development of machines which might be constructed by others," is inconsistent with the constitutional requirement that the patent grant must "promote the Progress of Science and useful Arts."

We are pointed to no factual basis in the record for the assertion that petitioner contemplates either the misuse or non-use of the combination patent, other than that

suggested in the court's opinion that the complete machine does the work better than the subcombination, without the knife, can do it and that there would be no reason to manufacture the partial machine when the complete machine was available. A separate opinion in which all the judges concurred also states that petitioner "admitted, both on argument and in its brief in the present case, that its purpose in filing the disputed claims was to 'protect' the main invention and that it had no intention of manufacturing the subcombination machine." The reference, as agreed by counsel on the argument before us, is to a statement in petitioner's brief in the court below that: "The claims in issue are sought purely to prevent appropriation of the . . . machine by the obvious expedient of eliminating the splitting mechanism." It will be observed that this statement of petitioner is not of a purpose either to suppress the use of the patented invention or to use it or the patent to exploit or enlarge the patent monopoly of the complete machine.

The court below found support for its conclusion in our decisions holding that a patentee may not enlarge the monopoly of his patent by licensing his invention on terms or conditions which tie to its use the use of material or devices which the licensed invention does not embrace, whether they are patented, *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 459; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, or unpatented, *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502; *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451; *Carbice Corporation* v. *American Patents Corp.,* 283 U. S. 27; *Leitch Manufacturing Co.* v. *Barber Co.,* 302 U. S. 458.

It is clear that no such case is presented here. We find nothing in the statement quoted from petitioner's brief in the court below or in the record to indicate that petitioner proposes to make any such use of the patent which

it now seeks, either by the method of licensing it or otherwise. The statement expresses only a purpose to prevent appropriation of the complete machine by the appropriation of a part of it embodied in the subcombination for which the patent is asked. There is nothing to suggest any purpose or reason for a purpose to enlarge the monopoly either of the subcombination or of the complete machine by tying together their uses. Control of a part could not be used as a means of enlarging an already acquired control of the whole. And, obviously, licensing the subcombination, which is less useful than the whole, would not, in any circumstances disclosed by the record, be a practical means of enlarging the use of the whole. Failure to acquire control of the whole would be a legitimate reason for wishing to acquire and retain control of a part, if it involves a patentable invention. And we think it plainly is legitimate to use a patent on the subcombination as a means of preventing appropriation by others of petitioner's more important complete invention which he is using, where there is absent, as there is here, any purpose to enlarge the monopoly of either invention.

A patent on the combination embodied in the complete machine, without the allowance of the subcombination claims, would not, as the court below thought, prevent the free use of the subcombination. *Corn-Planter Patent,* 23 Wall. 181, 224; *Schumacher* v. *Cornell,* 96 U. S. 549, 554; *Rowell* v. *Lindsay,* 113 U. S. 97, 101; *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661, 668. Hence denial of a patent on the subcombination would deprive the inventor of the benefit of the exclusive right to use the subcombination in the ways specified by the patent laws. It would also leave the public free to use, and thus to appropriate a part, however important, of the inventor's complete machine, even though patented.

If, as we must assume, petitioner has two inventions, both of which are useful and one of which includes the other in its entirety, it is evident that the value of the former would be greatly impaired if the subcombination invention could be freely used by others. See *Deering* v. *Winona Harvester Works,* 155 U. S. 286, 302. But such appropriation or impairment of the value of the full combination could be achieved only by appropriation of the unpatented subcombination which is by hypothesis also a useful invention, entitled to claim the benefit and protection of the patent laws.

The statutes permit, and it is the settled practice of the Patent Office, many times sustained by this Court, to allow, claims to a combination and also its subcombinations. *Philadelphia, W. & B. R. Co.* v. *Dubois,* 12 Wall. 47, 60; *Deering* v. *Winona Harvester Works, supra; Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 301, 318; *Altoona Theatres* v. *Tri-Ergon Corp.,* 294 U. S. 477, 487; *Mercoid Corp.* v. *Mid-Continent Co., supra,* 667. The question then is whether, without more, the use of the subcombination patent to prevent appropriation of the complete machine so infringes any provisions or principles of the patent laws, or is so contrary to principles governing the award of equitable relief, as to permit the court to refuse the judgment, which the statute authorizes, directing that the patent issue.

In answering it the court below assumed that such purpose to protect the whole invention was to be achieved by complete suppression of the use of the subcombination invention and that the suppression for the protection of the complete machine would invalidate the patent because it would be contrary to the constitutional purpose and to the spirit if not the letter of the patent laws. We think both assumptions are unwarranted. Section 4886 of the Revised Statutes authorizes "any person who has in-

vented . . . any new and useful . . . machine" to "obtain a patent." The patent grant is not of a right to the patentee to use the invention, for that he already possesses. It is a grant of the right to exclude others from using it. As the statute, R. S. § 4884, provides, the grant is of the "exclusive right to make, use, and vend" the invention, and this includes the exclusive right to license others to make, use and vend it. By the very terms of the statute the grant is nothing more than a means of preventing others, except under license from the patentee, from appropriating his invention.

It by no means follows that such a grant is an inconsistent or inappropriate exercise of the constitutional authority of Congress "to promote the Progress of Science and useful Arts" by securing to inventors "the exclusive Right to their . . . Discoveries." Congress, in the choice of means of promoting the useful arts by patent grants, could have provided that the grant should be conditioned upon the use of the patented invention, as in fact it did provide by the Act of 1832 (4 Stat. 577) authorizing the issue of patents to aliens conditioned upon the use of the invention, which provision was later repealed (5 Stat. 117, 125). But Congress was aware that an unpatented invention could be suppressed and the public thus deprived of all knowledge or benefit of it. It could have concluded that the useful arts would be best promoted by compliance with the conditions of the statutes which it did enact, which require that patents be granted only for a limited term upon an application fully disclosing the invention and the manner of making and using it. It thus gave to the inventor limited opportunity to gather material rewards for his invention and secured to the public the benefits of full knowledge of the invention and the right to use it upon the expiration of the patent.

This Court has consistently held that failure of the patentee to make use of a patented invention does not affect

the validity of the patent. *Continental Paper Bag Co.*
v. *Eastern Paper Bag Co.*, 210 U. S. 405; *Crown Die &
Tool Co.* v. *Nye Tool Works*, 261 U. S. 24, 34; *Wood-
bridge* v. *United States*, 263 U. S. 50, 55; *Fox Film Corp.*
v. *Doyal*, 286 U. S. 123, 127; *Hartford-Empire Co.* v.
*United States*, 323 U. S. 386, 433. No question of non-use
was involved in *Ethyl Gasoline Corp.* v. *United States,
supra,* 459, on which the court below relied, and it lends
no support to the contention that a patentee may not
rightly use his patent as a protection against misappro-
priation of his invention, even though it is not used. There
it was held only that the monopoly of a patent afforded
no defense for violations of the Sherman Act which the
patentee had effected by using his patent to enlarge the
patent monopoly beyond the grant and as a means of in-
creasing the use of an independent patented invention.

Congress has frequently been asked to change the policy
of the statutes as interpreted by this Court by imposing
a forfeiture[1] or providing for compulsory licensing[2] if
the patent is not used within a specified time, but has not
done so.

We have no occasion to consider here whether a better
rule governing the grant of patents could be devised than
that prescribed by Congress, as this Court has interpreted
it; or whether the courts on equitable principles should
decline to enjoin patent infringements or decline to com-
pel the issue of a patent if and when it appears that the
patentee or inventor intends to make no use of the in-
vention. The record neither calls upon nor permits us to
decide any of these questions, for it fails to establish that
petitioner has any such intention. Petitioner's intended
use of the patent to prevent others from appropriating it
and by that means from appropriating an essential part of

[1] See *Hartford-Empire Co.* v. *United States, supra,* 433, n. 26.

[2] See *Hartford-Empire Co.* v. *United States, supra,* n. 27.

his complete machine is in no way inconsistent with petitioner's making other permissible uses of the subcombination patent. In fact, he does use the subcombination as a part of his completed machine and proposes to continue to use it. Execution of his declared purpose to prevent appropriation of either of his inventions, whether used separately or together, would not prevent his licensing others to make, use and vend the subcombination, on terms which would adequately protect the value of the monopoly of both his inventions to which he is entitled by the patent laws. And we cannot say that others, who could not secure a license to use the complete machine, would not find it profitable to secure, or that petitioner would not find it profitable to grant, licenses to use the subcombination which the court below has found to be a useful device which has advanced the art.

· The record establishes no intention by petitioner not to use his invention, and no proposed use of it disclosed or suggested by the record affords any basis for withholding the grant of the patent. The judgment below must therefore be reversed, and the cause remanded to the Court of Appeals for further proceedings in conformity to this opinion to enable it to consider and decide the issues raised by the pleadings. See *Bates* v. *United States,* 323 U. S. 15, 17 and cases cited.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MURPHY concur, dissenting.

The right of suppression of a patent came into the law over a century after the first patent act was passed. In 1886 Judge Blodgett had ruled that a patentee "is bound either to use the patent himself or allow others to use it on reasonable or equitable terms." *Hoe* v. *Knap,* 27 F. 204, 212. In 1896 that rule was repudiated by the Circuit

Court of Appeals for the Sixth Circuit in *Heaton-Penin-sular Button-Fastener Co.* v. *Eureka Specialty Co.*, 77 F. 288, 295, where the court stated that a patentee's "title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself, nor permit others to use it." That theory was adopted by this Court in *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.*, 210 U. S. 405, decided in 1908. That was an infringement suit. One defense was that the patentee had suppressed the patent. The Court held, Mr. Justice Harlan dissenting, that suppression of the patent was no defense; that the patentee's "right can only retain its attribute of exclusiveness by a prevention of its violation." *Id.*, p. 430.

I think it is time to be rid of that rule. It is inconsistent with the Constitution and the patent legislation which Congress has enacted.

Article I, § 8 of the Constitution grants Congress the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Of the various enumerated powers it is the only one which states the purpose of the authority granted Congress. "The Congress is given no general power to issue letters patent or to reward inventors as it will. An experience with grants of monopoly in England was fresh in the minds of the Fathers; the lesson had been underlined in recent differences with the Crown." Hamilton, Patents and Free Enterprise (1941), p. 152, Temporary National Economic Committee, Monograph No. 31, 76th Cong., 3d Sess. The purpose "to promote the progress of science and useful arts" accordingly provides the standards for the exercise of the power and sets the limits beyond which it may not go. That purpose also provides

the guide for the interpretation of patent laws enacted pursuant to that power.

It is a mistake therefore to conceive of a patent as but another form of private property. The patent is a privilege "conditioned by a public purpose." *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U. S. 661, 666. The public purpose is "to promote the progress of science and useful arts." The exclusive right of the inventor is but the means to that end. That was early recognized by this Court. See *Pennock* v. *Dialogue,* 2 Pet. 1, 19; *Kendall* v. *Winsor,* 21 How. 322, 327–328; *Seymour* v. *Osborne,* 11 Wall. 516, 533–534. But the *Paper Bag* case marked a radical departure from that theory. It treated the "exclusive" right of the inventor as something akin to an "absolute" right. It subordinated the public purpose of the grant to the self-interest of the patentee.

The result is that suppression of patents has become commonplace. Patents are multiplied to protect an economic barony or empire, not to put new discoveries to use for the common good.[1] "It is common practice to make an invention and to secure a patent to block off a competitor's progress. By studying his ware and developing an improvement upon it, a concern may 'fence in' its rival; by a series of such moves, it may pin the trade enemy within a technology which rapidly becomes obsolete. As often as not such maneuvers retard, rather than promote, the progress of the useful arts. Invariably their effect is to enlarge and to prolong personal privilege within the public domain." Hamilton, *op. cit., supra,* p. 161. One patent is used merely to protect another. The use of a new patent is suppressed so as to preclude experimentation which

---

[1] For illustrations see Investigation of Concentration of Economic Power, Hearings, Temporary National Economic Committee, Pt. 2 (1939), pp. 345, 776; Hamilton, *op. cit., supra,* pp. 46–47, 59.

might result in further invention by competitors.[2] A whole technology is blocked off. The result is a clog to our economic machine and a barrier to an economy of abundance.

It is difficult to see how that use of patents can be reconciled with the purpose of the Constitution "to promote the progress of science and the useful arts." Can the suppression of patents which arrests the progress of technology be said to promote that progress? It is likewise difficult to see how suppression of patents can be reconciled with the provision of the statute which authorizes a grant of the "exclusive right to make, use, and vend the invention or discovery." Rev. Stat. § 4884, 35 U. S. C. § 40. How may the words "to make, use, and vend" be read to mean "not to make, not to use, and not to vend"? Take the case of an invention or discovery which unlocks the doors of science and reveals the secrets of a dread disease. Is it possible that a patentee could be permitted to suppress that invention for seventeen years (the term of the letters patent) and withhold from humanity the benefits of the cure? But there is no difference in principle between that case and any case where a patent is suppressed because of some immediate advantage to the patentee.

I think it is time to return to the earlier, and I think the true, philosophy of the patent system. We should not pass on to Congress the duty to remove the private perquisites which we have engrafted on the patent laws. This Court

---

[2] The vice is the same as the practice, consistently condemned by this Court, of writing into the claims broad, general specifications. As stated by Mr. Justice Bradley in *Carlton* v. *Bokee,* 17 Wall. 463, 471–472, "We think it proper to reiterate our disapprobation of these ingenious attempts to expand a simple invention of a distinct device into an all-embracing claim, calculated by its wide generalizations and ambiguous language to discourage further invention in the same department of industry . . ."

was responsible for their creation. This Court should take the responsibility for their removal. I would adopt the view of *Hoe* v. *Knap, supra.* In a case like the present (*Butterworth* v. *Hoe,* 112 U. S. 50, 61), as in infringement suits (*Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488, 492–494), the Court sits as a court of equity. It should withhold its aid from a patentee who has employed or plans to employ the patent not to exploit the invention but to suppress it in order to protect another patent or otherwise.[3] Cf. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 459. If that purpose were clear, a patent should not issue in the first instance. If it has been issued and not cancelled and the patent has been suppressed, any one should be permitted to use it at least on payment of reasonable royalties. In that way the constitutional objective will be more nearly realized—the product of the inventive genius of the human mind will be put to work in the economy.

MR. JUSTICE RUTLEDGE, dissenting.

I would affirm the judgment. But I do not reach the interesting and important questions debated by the Court's opinion and my dissenting brethren. They are of such a character that, in my opinion, they should not be determined in the absence of a record presenting facts and issues making this necessary. In this case the facts do not so clearly present the issues of "fencing" and "blocking" that decision upon them is required or appropriate.

Those issues were not raised or considered until the case reached the Court of Appeals. Evidence concerning intent to suppress was not received in the District Court and

---

[3] These situations are to be distinguished from the case of the inventor who though he has an expectation of exploiting the patent has not yet arranged the necessary financing, or, for other reasons, has not yet been able to go into production.

petitioner is entitled to its day in court upon that question, unless it has conceded it. The record, as this Court's opinion indicates, is not clear that the concession has been made with the effect of admitting that petitioner had no intention to exploit the patent. If, as the trial court found, the machine without the splitting knife would not "produce any useful result," this fact together with the assertion of the claims relating to the full combination, or with it and the concessions apparently made in the Court of Appeals, might be sufficient to sustain that court's conclusion that the only purpose of the alleged invention was to "fence" or "block." But the Court of Appeals expressly rejected the trial court's finding in this respect; and a showing of motion pictures here, such as took place in the Court of Appeals, appeared to demonstrate conclusively that the machine not only works without the cutting knife, but produces a highly useful result if the pears are split before being placed in the machine for bobbing, peeling and coring. Whatever foundation might have been found, therefore, to support the conclusion of intent to fence or block, in the machine's lack of capacity to produce any useful result, disappears from the case. .

The record, however, discloses another ground which was considered in the Patent Office and the District Court, wholly sufficient to dispose of the case and requiring affirmance of the judgment. This was that the claims in issue are too broad to cover the invention. No one of the claims specifies or indicates that the pears must be pre-split in order for the invention to be used or to produce a useful result. With commendable candor, counsel conceded this in the argument here, and indeed the claims on their face require the concession. Patents are not to be granted upon claims which do not accurately describe the invention and all of its essential features. These claims are stated in language broad enough to include whole

pears. Admittedly the machine will not work, without the knife, as to them. In my judgment therefore the claims are too broad. The Patent Office and the District Court so found. The question is open and was presented in the Court of Appeals and here. Accordingly I would affirm the judgment.