50 CCPA

Thomas A. KIRKHAM and Norman W.
Rosenberg, Appellants,

v.

Thomas Victor ARDEN and Gilbert William Merriman, Appellees.

Patent Appeal No. 6974.

United States Court of Customs
and Patent Appeals.

April 25, 1963.

Roger T. McLean, New York City (John Boustead, New York City, of counsel), for appellants.

Bailey, Stephens & Huettig, Jennings Bailey, Jr., Washington, D. C., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

Kirkham et al., appellants, whose application, Serial No. 642,225, filed February 25, 1957, for alleged new improvements in Electrodialysis Process and Equipment, seek reversal of the decision of the Board of Patent Interferences awarding priority of invention to Arden et al., appellees, whose application, Serial No. 572,959, was filed March 21, 1956, for Electrodialysis Processes and Electrodialysis Cells.

The single count involved in this interference reads as follows:

"1. An electrodialysis apparatus comprising a plurality of juxtaposed multi-membraned units comprised of a plurality of parallel alternating anion-selective and cation-selective membranes forming alternate diluting and concentrating compartments having inlets and outlets, all the membranes of the apparatus

being parallel to each other, manifold conduit means interconnecting the outlets of all the diluting compartments of each unit to the inlets of the diluting compartments of another unit, thereby combining the effluents of the diluting compartments of a unit for passage as influent for the diluting compartments of said other unit, and electric current supplying means consisting of an anode at one end of the apparatus and a cathode at the other end of the apparatus for passing a direct current transversely through all the membranes and compartments."

The material aspects of the invention in issue are described by the board as follows:

"The invention in issue relates to the demineralization of water, that is to say the removal of dissolved salts from water, by electrodialysis. The basic cell, which is prior art to the present proceeding, is clearly shown in the figures of patent No. 2,708,658 granted to Rosenberg. A cation permeable membrane and an anion permeable membrane form a central chamber in a saline solution container. A cathode in one end chamber and an anode in the other end chamber induce ion migration and because of the selective permeability of the membranes deconcentration of the saline in the central chamber may be made to occur with attendant increase in concentration in the end chambers. By reduplicating membrane pairs a plurality [of] 'central' chambers may be formed such that in alternate ones of which deconcentration takes place (the witnesses mostly refer to this as dilution) and in the others, concentration. Mechanical details of one such arrangement is shown pictorially in patent No. 2,826,544 to D. R. Dewey II. The construction might be referred to as a stack of cells. It is our understanding that the individual deconcentration cells of stacks had been arranged with

inlets and outlets connected either so that the solution flowed through them in seriatim or else in parallel to a receiver system.

"The invention in issue as set forth in the count is the organization of a plurality of cells *energized by a single anode and a single cathode* into groups, the flow through the deconcentration (dilution) cells of each group being parallel and the flow through the groups being in series, from group to group." (Emphasis added.)

The decisive issue is whether appellants (junior party) have carried the burden incumbent upon them of showing by a preponderance of the evidence actual reduction to practice prior to the date (March 22, 1955) accorded to appellees (senior party).

The board held that the evidence submitted did not prove reduction to practice of the invention defined by the count and, accordingly, awarded priority of invention to appellees.

In support of their contentions, appellants took testimony. Appellees relied upon the filing of an application in Great Britain on March 22, 1955.

Appellants state that they rely primarily upon the testimony of witnesses Mintz and Lindstrom, "since they did the experimental work and are not applicants."

The experimental work on appellants' apparatus was done at two places, namely, Ionics, Incorporated, Cambridge, Massachusetts (hereinafter referred to as Ionics) and at Woods Hole Oceanographic Institute, Massachusetts (hereinafter referred to as Woods Hole). Ionics is the assignee of appellants' application.

Mintz testified that he was assigned to Ionics in December 1952 to construct an electrodialysis unit for the demineralization of sea water in compliance with a contract then in force with the Navy Bureau of Ships and that he received all of the necessary design and technical information, available at that time, from the witness Lindstrom, an employee of

Ionics assigned to pilot plant work relating to multiple electrodialysis. Mintz did not recall ever seeing the contract with the Bureau of Ships but did see "some of the technical specifications for it." The contract itself, though in the possession of the assignee, was never introduced in evidence. The witness testified in detail explanatory of various drawings relating to the construction and testing of a 15-gallon per hour sea water demineralization unit according to the terms of the contract with the Bureau of Ships. He defined the term "stage" as a group of cells operated hydraulically in parallel and described a "cell" as a fluid chamber defined by a pair of permselective membranes. The objective sought was to produce drinking water, "approximately 200 parts per million water and also, *initially, 5 ppm water from sea water.*" (Emphasis ours.) He testified that the fluid flow in two streams through stages was through alternate membranes in each stage; that the stream which is desalted is referred to as a diluting stream and the other a concentrating stream, each stream going through the stages in series and the current which produces electrodialysis flows in series through stages 1 to 4. He stated that this group of stages, referred to as a subcombination, is a part of the entire apparatus and of itself meets the count.

A careful analysis of the testimony of Mintz is productive of the conclusion that the series of tests run at Ionics were not of the complete apparatus but were units of it consisting of several stages between a single pair of electrodes. An engineering report was introduced stating in part that "BuShips-Trouble-shooting continues, latest data indicates 6-series stages reduced salts from 37,000 to 2,000 ppm." Mintz's explanation of this report was that "This would probably reflect the fact that we had tested only a portion of the entire system labeled 'S-1' or any of the subsequent designs and the water had been demineralized to the extent shown." After the series of tests were run at

Ionics using mostly sodium chloride solution, the apparatus was shipped to Woods Hole where tests were resumed with the use of sea water, applying the same staging procedure followed at Ionics. Various changes were made for various purposes in the arrangement of the apparatus. That which was described as the "rough demineralizer" succeeded in reducing sea water at 32,000 ppm to 8,000 ppm. Testing with further stages in the stack with separate electrodes salinity was reduced at different times to around 100–250 ppm. The period of time consumed by the testing at Woods Hole ran from June 1953 to around the middle of August 1953.

Cross-examination of Mintz made it abundantly clear that, although the apparatus was designed, constructed and tested to meet the specifications and requirements of a contract with the Navy, the witness believed, however, that the Navy was to buy the unit if it performed satisfactorily; that by the end of 1953 work on the apparatus was abandoned and work on a new unit was begun "utilizing a different principle of construction" not involving internal staging and not embodying the construction of the count of the interference; that nothing was done to revive interest in the type of device demonstrated at Woods Hole as "we had jointly arrived at the decision that the system was too complex and that we would, in the future, work on parallel units only."

While as noted above the contract with the Navy was not introduced, however, during cross-examination of Mintz, the following excerpt therefrom was read into the record:

" * * * Upon completion of the tests as outlined and if the tests are satisfactory to the extent that the Contracting Officer intends to have shipboard tests conducted, the Navy shall have the *option to acquire title to the prototype demineralizer upon payment of the contrator (sic) of* —————, which sum is the estimated cost of the materials and com-

ponents which shall be embodied in the demineralizer, and for which the contractor will not have been previously reimbursed. In the event that the option is not exercised by the Navy within sixty days from the completion of the tests, as outlined in Sections 1 through 4 above, the prototype will be shipped back to the contractor who shall retain title thereo." (Emphasis added.)

In this connection Mintz stated that he considered that the device had been sufficiently demonstrated to prove its utility on shipboard and that a suitable product could be made. The witness further testified that the various phases of the work done by him at Woods Hole represented a construction wherein each phase differed in some detail from a previous phase and that most of these variations he himself made.

The witness Lindstrom was jointly associated with Mintz in the testing of the apparatus. His testimony generally corroborates that of Mintz relating to the construction and testing of the apparatus at Ionics and Woods Hole. He testified that the operation of the device with two major steps of demineralization at the same time was somewhat complicated in the early stages, so "it was decided to get one unit working rather more or less perfectly first and then try and combine the two"; that the last unit at Woods Hole had four electrical stages; that there were modifications at Woods Hole changing numbers of stages and changing "anodes or solution flow configurations" and that the initial and final design at Woods Hole *had several pairs of anodes and cathodes.*

The party Rosenberg, Assistant Director of Research at Ionics during 1952 and 1953, testified that it was found desirable in order to prevent excessive demineralization to pass the solution through a few chambers and then mix it and repass it, *using a separate set of electrodes on each stage* and that the device tested at Woods Hole was "an experimental apparatus; it was frankly this."

The party Kirkham, Senior Chemical Engineer at Ionics with responsibility for all the engineering aspects of the company's electrodialysis program, testified that he and Rosenberg were jointly responsible for the inventive subject matter of their application evolving the concept of using the same current in a number of hydraulic stages when dealing with the high electrolyte concentrate such as found in sea water.

The witness testified that he observed the tests made at Ionics and that they showed, over short periods of time "amounting to several hours," a satisfactory degree of demineralization obtained on the individual sections and also on the over-all unit; that he observed the operation at Woods Hole in August 1953, and that the unit achieved demineralization down to "some reasonable level" but was not "achieving the overall degree of demineralization required by the contract * * * of something like 5 parts per million," and that the water was potable.

The state of the testimony adduced on behalf of appellants to establish reduction to practice of the invention of the count in issue leaves, in our opinion, much to be desired. The testimony supports the conclusion that the work assigned to Mintz and done by him with the aid of Lindstrom under the authority and supervision of Rosenberg and Kirkham had as its intendment and purpose the construction and testing of a complete apparatus to meet the specifications and requirements of the Ionics contract with the Navy. This conclusion is fortified by the fact that testing was done by stages; by reference to subcombination; to "interstaging"; to getting one unit working first and then try and combine; testing individually in sections "rather than starting out with a fully assembled stack of all sections" and testing "just a part of the unit * * * the top section of the unit."

The first tests were run with four stages of cells, then six, followed by tests with other stages in the stacks of cells. During the testing processes, vari-

ous changes were made in the arrangement of the apparatus. There was disassembly and reassembly for various purposes succeeded by further experimentation in the effort to achieve the desired degree of salinity with an operable device contemplated as a complete unit. Mintz testified, with corroboration, that in the first sets of cells there were at all times six stages with a common anode and cathode hydraulically connected as required by the count. This phase of the test, with what was designated by some as the rough demineralizer, succeeded in reducing sea water of 32,000 ppm to 8,000 ppm. Testing with further stages in the stack, as previously noted, salinity was reduced to around 100–250 ppm.

While Mintz and others testified that several of the sectional tests were satisfactory and that phases of the operation met the count, continuous and persistent efforts with subsequent stages with various changes in the unit are strongly indicative that none of those connected with the operation at Ionics or Woods Hole were satisfied with the function of the sections of the device tested or the product obtained.

There is no dispute that the sole purpose for the construction of the apparatus and the manifold tests run to establish its practical operability and utility to achieve satisfactory results in the reduction of the salinity of sea water was to meet the specifications and conditions of the contract with the Navy.

Appellants contend that the board was in error in its finding that the "testimony would seem to indicate that the Navy wanted a reduction of sea water to 5 parts per million."

We think the record furnishes a reasonable basis upon which to predicate the above quoted statement in the board's opinion.

As noted above, Mintz testified that the objective was "initially" to reduce the salinity of sea water to 5 ppm. The party Kirkham testified that he observed the operation of the unit at Woods Hole and that it did not obtain the degree of demineralization required by the contract, which was "something like 5 parts per million." It may well be that the contract specifications in the possession of appellants or their assignee would settle this phase of the matter. For reasons stated by appellants' counsel into which we do not inquire, although the contract was called for, it was not introduced.

It is pertinent to note, however, that the paragraph of the contract which was put into the record gave the Navy an option to acquire title to the prototype demineralizer upon the condition that satisfactory tests be completed to the extent to have shipboard tests conducted. In the event the Navy did not exercise its option, title to the apparatus would be retained by the other contracting party. The Navy did not exercise the option. Notwithstanding these circumstances, appellants contend that the tests at Woods Hole were satisfactory and that utility had been demonstrated. If this be true, the record discloses no insuperable problems sufficient to foreclose the running of shipboard tests. The apparatus was returned to the Ionics plant at Cambridge, disassembled and abandoned. The work that was thereafter done for the Navy was on a different device. In the absence of evidentiary clarification of this situation, the conclusion seems inescapable that there had been no reduction to practice as a result of testing by sections or subcombinations or of the complete device sufficient to demonstrate practical utility. There is not the slightest justification for any assumption that the Navy rejected the apparatus on grounds other than those of substance. The evidence strongly indicates, both directly and circumstantially, that Ionics was not satisfied that the stages or combinations tested were capable of being used for practical purposes. This conclusion is supported by the testimony that the system was "too complex" and that resort was had to a different design after abandonment of the apparatus under consideration. Work on

the apparatus described in appellants' application was never resumed.

This court said in Stenger et al. v. Holmes, 103 F.2d 410, 26 CCPA 1224:

"* * * We cannot see why, if they were so satisfied, they laid it aside for more than fourteen months and devoted their activities to a solution of the same problem on a different invention."

The apparatus was abandoned in the latter part of 1953. Appellants delayed filing their application for patent until February 25, 1957. The only explanation offered of record relative to this delay revolves around the heavy work load which Ionics had imposed upon counsel retained to process its over-all patent work. This would seem wholly insufficient to support even an inference of diligence. This circumstance, of itself, lends credence to appellees' contention that there had been no reduction to practice of the invention at the end of the experiments and that the apparatus was neither successful nor practical.

In addition thereto, this circumstance not only augments the inferences which logically flow from the testimony that Ionics had no conviction of success upon completion of the tests at Woods Hole but also supports the theory advanced by appellees that the work done by and on behalf of the appellants "constituted at best an abandoned experiment."

■ We think pertinent to this situation is the language employed by this court in Conner v. Joris, 241 F.2d 944, 44 CCPA 772. The court said:

"We are aware of the fact that once an inventor has completely reduced his invention to practice, he is not required in an interference to show subsequent diligence in applying to the Patent Office for patent protection. Bowers v. Valley and Ernst, 149 F.2d 284, 32 C.C.P.A., Patents, 1039. However, it is also well established that when there is doubt as to whether there has been an actual reduction to practice, the

inventor's subsequent conduct may disclose that, instead of a reduction to practice, the acts relied on show that what was done amounted only to an abandoned experiment. Bowers case, supra."

■ It is axiomatic that the evidence must show reduction to practice of a device meeting every limitation of the count. As we have noted, the tests were of parts or sections of the demineralizer as a whole. The complete structure contemplated by appellants required the use of more than one set of electrodes. The count therefore will not read upon the demineralizer as a whole, as the count recites "electric current supplying means *consisting* of an anode at one end * * * and a cathode at the other end of the apparatus * * *."

The appellants rely on Field v. Knowles, 183 F.2d 593, 37 CCPA 1211. We are convinced that the evidence adduced in support of a reduction to practice does not measure up to the standards required by Field v. Knowles, supra, and the cases therein cited, in that the proof in the instant case fails to show the "practical utility" of the device "in its intended field of use" or "Actual performance * * * of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful." The record shows abandonment of the apparatus for the reason that it was "too complex." This hardly comports with the language of the cited case that if "* * * the expense of the machine and its operation are such as to militate against practical consideration * * * as commercially useful," the burden of proving actual reduction to practice has not been carried.

■■ The case of Special Equipment Co. v. Coe, 324 U.S. 370, 65 S.Ct. 741, 89 L.Ed. 1006, cited by appellants in support of the contention that the board failed to recognize the patentability of a subcombination per se, does not, in our opinion, bear relevancy to the factual

situation here presented. We agree with the board that:

" * * * We apprehend that it is possible that a subcombination may be reduced to practice in the course of attempts to reduce to practice a combination in which it is to be included. Whether reduction to practice of the subcombination requires concomitant reduction to practice of the combination would depend upon the nature of each and the interdependence between them. In any case the subcombination relied upon must stand on its own feet as a recognized invention of demonstrated practical utility. The record adduced here does not show that the portion that has been referred to as a rough demineralizer was recognized as an invention at or before the time that it was discarded along with the other stages of the apparatus. There is nothing to show that it was considered or recommended for use either by itself or in other combinations at or subsequent to the discontinuation of the tests at Woods Hole, except the statement by one of the joint inventors that the principle was employed in 1958, considerably after all of the involved applications were filed."

For the reasons stated, we are of the opinion that the record before us amply sustains the decision of the Board of Patent Interferences. The decision of the board is accordingly affirmed.

Affirmed.

SMITH, Judge, concurs in result only.